## Richmond

WILLIAM HELGE V. JOHN B. CARR.

November 29, 1971.

Record No. 7640.

Present, Snead, C.J., Carrico, Gordon, Harrison, Cochran and Harman, JJ.

*Robert M. Furniss, Jr. (Furniss, Davis and Sachs, on brief), for plaintiff in error.*

*Edward R. Willcox, Jr.; William E. Rachels, Jr. (Willcox, Savage, Lawrence, Dickson & Spindle, on brief), for defendant in error.*

HARRISON, J., delivered the opinion of the court.

John B. Carr (plaintiff) filed his motion for judgment against William Helge (defendant) seeking to recover damages suffered by him when he was struck by an automobile driven by Helge.

There have been two jury trials of this case. The first, on August 12, 1969, resulted in a verdict for defendant. On motion of the plaintiff, and over objection, this verdict was set aside by the trial court and a new trial awarded. At the second trial held August 7, 1970, there was a verdict of $25,000 in favor of Carr, upon which the trial court entered final judgment. The defendant assigned numerous errors and we granted him a writ of error.

The facts may be briefly summarized. On February 19, 1968, shortly after noon, when the weather was clear and the roadway dry,

Carr, while walking north along Military Highway in Norfolk, was struck by a car driven by Helge. This road is a divided highway, with two north and two south lanes separated by a median grass strip. Just to the right of the pavement of the north lane is a gravel and dirt shoulder approximately 15 feet wide. A white line marks the right edge of the paved or concrete portion of the highway. The permitted speed limit in the vicinity is 45 miles per hour.

Carr testified that immediately before the impact he was walking north on the extreme right edge of the pavement with his back to the following traffic. He described the traffic as relatively heavy and said that all the cars that came along found "ample room to pull out and make room for me". He has no recollection of what happened at the time of the accident.

Helge testified that as he approached Carr he observed him walking north on the paved surface of the highway; that Carr was then from 18 inches to 2 feet from the right edge of the concrete road; that he (Helge) was following other cars in the extreme right or outside lane of traffic and was proceeding in a northerly direction; that the car immediately in front of him passed Carr safely; and that after the front of his vehicle had passed Carr he heard a bump which he then thought was a blowout. It developed that Carr struck or had been struck by the Helge vehicle.

George H. Henniker was operating the vehicle immediately in front of Helge. He observed Carr walking "two foot inside the road" with his back to traffic. Henniker "veered toward the center lane and passed him". Because he thought Carr was in a dangerous spot he looked back to see if other cars "were getting around him" and saw Carr "flying through the air". He stopped and went back to the scene at which time Carr said to him, "I collapsed".

Mrs. Mary T. Glaubke was riding with Mrs. Marianne W. Estes in a vehicle that was immediately behind Helge. She said that she "looked up just to see it in time just to hit him and to spin him around". She did not observe where Carr was standing at the time of impact, but stated that she never saw the Helge car go off the road.

On December 23, 1968 the plaintiff took the discovery deposition of Mrs. Estes. At the August 12, 1969 trial plaintiff filed with the court a letter from Dr. John H. Furr to the effect that Mrs. Estes was unable to appear at the trial and that her appearance would have an adverse effect on her illness. Plaintiff then sought to have

introduced into evidence, and considered by the jury, the discovery deposition of Mrs. Estes. Her evidence was that Carr was struck while walking on the shoulder of the highway. For reasons hereinafter detailed the court ruled the deposition inadmissible.

The defense at both trials was that the testimony of Carr plainly established his contributory negligence as a matter of law and barred his recovery.

In view of our decision it is unnecessary that we consider the numerous assignments of error made by defendant. Assuming, but not deciding, that the trial court did not err in submitting the issue of contributory negligence to the jury, there is credible evidence on which the jury could have concluded that the plaintiff was guilty of contributory negligence, and found its verdict for the defendant, as it did at the first trial.

The dispositive issue on this appeal is whether the ruling of the lower court that Mrs. Estes was an incompetent witness finds support in the evidence and was a proper exercise of discretion. If so the verdict of the jury rendered in the first trial should not have been set aside.

The law which controls our decision is set forth in the case of *Coleman* v. *Commonwealth*, 66 Va. (25 Gratt.) 865, 874-75 (1874), where we held:

> "There can be no doubt, that the rule laid down by Peake in his work on Evidence, and approved by the Court of Errors of New York in the case of Hartford v. Palmer, 16 John. R. 143, is sound and reasonable, and is one, as said by the court in that case, 'which cannot fail to command the respect of all mankind'; to wit, 'that all persons who are examined as witnesses must be fully possessed of their understanding; that is, such understanding as enables them to retain in memory the events of which they have been witnesses, and gives them a knowledge of right and wrong; that, therefore, idiots and lunatics, whilst under the influfluence of their malady, not possessing their share of understanding, are excluded.'
>
> ". . . If at the time of his examination he has this share of understanding, he is competent. That is the test of competency, and of such competency the court is the judge; whilst the weight of testimony—the credit to be attached to it—is left to the jury."

Regarding the competency of a witness and the capacity of communication 2 Wigmore, Evidence (3rd ed. 1940) reads in part:

"(1) First, it involves as capacity *mentally to understand* the nature of questions put and to form and communicate intelligent answers.

"(2) Secondly, does it involve a sense of *moral responsibility*, of the duty to make the narration correspond to the recollection and knowledge, *i.e.* to speak the truth as he sees it? It would seem that the clear absence of such a sense would disqualify the witness." § 495 at 587.

"If it is asked further what shall be the standard by which this capacity to observe, recollect, and communicate is to be judged, the law is found very properly declining to lay down any more detailed rules. The *trial Court* must determine this capacity. Any more restricted rule, however ingenious, would fail of its purpose, and would hamper rather than assist the process of procuring trustworthy testimony." § 496 at 588.

*See also District of Columbia* v. *Armes,* 107 U. S. 519, 2 S. Ct. 840, 27 L. Ed. 618 (1882); *Lewis* v. *Commonwealth,* 193 Va. 612, 70 S. E. 2d 293 (1952); Annot., 11 A. L. R. 3d 1360 (1967); 97 C. J. S. *Witnesses* § 119 at 529 (1957); 20 Am. Jur. *Evidence* § 348 at 323 (1939).

In the instant case Dr. Furr was examined for the purpose of determining the competency of Mrs. Estes. It was stipulated that he practiced psychiatric medicine and was "eminently qualified to testify". Further, Mrs. Estes was his patient. Dr. Furr wrote the letter that said she would be unable to appear at the August 12, 1969 trial and she had been under his care for "a severe psychiatric illness" since June 20, 1969. In the letter he expressed the opinion that her testimony would be subject "to the confusion associated with her illness", and her appearance would be expected to have an adverse effect on her illness.

Dr. Furr first saw Mrs. Estes on June 16, 1967, when she was admitted to the emergency room of the Norfolk General Hospital "because of bizarre behavior and irrational thinking". On June 20, 1967 he saw her in his office. Her history revealed emotional instability from childhood. She had been "behaving irrationally", was "mentally upset" and had been "unmanageable" for approximately two weeks. His diagnosis was "schizophrenic reaction, chronic un-

differentiated type". He testified that she was "psychotic", explaining the psychosis as "characterized by a disorder of thinking whereby a patient is incapable of realistic and logical reasoning". The treatment he prescribed consisted of tranquilizing medication and psychotherapy.

Mrs. Estes consulted Dr. Furr again on June 21, 1969 at which time he found her condition the same as it was when he first saw her. Her diagnosis continued, "schizophrenic reaction, chronic undifferentiated type". She was hospitalized on the psychiatric floor of the Norfolk General Hospital from June 21, 1969 to July 11, 1969.

Between the interval of Mrs. Estes' visits to Dr. Furr he testified that she was attended by two other psychiatrists, Dr. William Gibbs, who saw her over a relatively long period of time, and Dr. Fathy A. Abdou.

Dr. Furr was permitted to read the discovery deposition given by Mrs. Estes on December 23, 1968. He was specifically questioned as to her competency to testify and to give this deposition. He said that with "reasonable medical certainty" his opinion was that she would not be competent; that he would question the accuracy of her recollection of the events of the accident; that it would be untrustworthy; and that Mrs. Estes was incompetent to testify "[b]ecause she is in poor contact with reality. This is characteristic of her illness".

It appears that shortly after the accident involved here Mrs. Estes gave statements that were at variance with the testimony she gave in her discovery deposition. In commenting on this Dr. Furr expressed the belief that "the same fear", which caused her to give conflicting versions of the accident, "presumably is still operating". He commented on the fact that she had "changed her testimony", and noted her statement that for about two weeks before she gave the deposition she had "more or less talked to God about it".

After hearing Dr. Furr's testimony the trial court ruled that Mrs. Estes was incompetent when she gave the discovery deposition and that it should not be admitted.

After the verdict the trial court concluded that it had erred and that Dr. Furr was not qualified to speak on Mrs. Estes' mental condition and competency as of December 23, 1968. It apparently held that only a doctor who was attending Mrs. Estes at that time would have been competent to so testify. For this reason it set aside the verdict of the first jury and awarded plaintiff a new trial.

We disagree. Dr. Furr was in a position and competent to testify about the mental condition and responsibility of Mrs. Estes. He was the physician who saw her at the time of the serious onslaught of her illness on June 16, 1967. She went to see him on June 20, 1967 and again on June 21, 1969. On the last visit his examination disclosed no change or improvement in her condition during the interim. It was in 1969 that Mrs. Estes "frantically said she would go all to pieces if she had to testify in the trial".

From his examination, observation and information Dr. Furr concluded that she had been largely irrational during the intervening two years, 1967-69. A part of this information came from the two psychiatrists who had been treating her during that period, Dr. Gibbs and Dr. Abdou. Furr testified, without objection, that while he did not have the records of the other two psychiatrists, "I have spoken with them, I have a part of Dr. Gibbs' records with me".

The record shows that filed with plaintiff's written motion for a new trial, following the verdict in the first trial, as an exhibit, is a letter written by Dr. Abdou, dated April 23, 1969, in which the subject was Mrs. Estes. The letter contains this paragraph:

"At the request of Mr. Estes, husband of the above named patient, we are to inform you that she has been under our psychiatric care since June 30, 1967. She has been treated with shock treatment, medication and psychotherapy, and currently I would think that her mental condition is not too stable to withstand any unnecessary stress such as participating in a court procedure."

It is obvious that Dr. Furr was testifying, not only from his personal knowledge, but with knowledge that his patient had also been under the psychiatric care of other psychiatrists since June, 1967 and the nature and extent of their treatment of her.

The court specifically questioned Dr. Furr about the testimony of Mrs. Estes given on December 23, 1968, and asked him the following question: "But you say that this is a derangement such as to negative trustworthiness upon the specific subject of the testimony?" The doctor answered: "Yes, sir." The court read to the doctor this quotation from an opinion in a decided case: " 'If at the time of his examination he has a sufficient share of understanding to appreciate the nature and obligation of an oath, to discern between right and wrong, and to retain in memory the events of which he has been

witness, he is competent.' " The court then asked Dr. Furr: "Is that still your opinion after hearing this law, that her recollection of the events would be untrustworthy?" The doctor replied that, having had the benefit of reading the discovery deposition given by Mrs. Estes he was in a position to answer the court's question, and answered "she is *incompetent*".

Clearly it was the responsibility of the trial court to determine the competency of Mrs. Estes to testify on December 23, 1968. The court had before it the testimony of an eminently qualified psychiatrist who was one of the three attending physicians of the witness. This physician, from a knowledge of his patient's history, background, her condition on the various occasions that he had seen her, her reaction and answers to questions propounded at the time of her discovery deposition, and information from her other two attending psychiatrists, testified without reservation or equivocation that she was incompetent.

With this evidence before it the trial court ruled the witness incompetent and excluded her deposition. This was a considered judgment. It was a ruling supported by credible evidence from a competent witness, and it should not have been disturbed.

Accordingly, the judgment of the trial court for plaintiff, John B. Carr, entered August 7, 1970, is reversed and vacated. The judgment of the trial court, entered November 28, 1969, setting aside the verdict of the jury rendered August 13, 1969 for the defendant, William Helge, is reversed, the verdict is reinstated, and a final judgment will be entered for the defendant.

*Reversed and final judgment.*