## Richmond

JOHN TURNBULL, A/K/A GEORGE WAGGENER V. COMMONWEALTH OF VIRGINIA.

October 10, 1975.

Record No. 750325.

Present, All the Justices.

*Peter G. Decker, Jr. (Chris A. Christie; Decker, Zoby, Collias & Christie,* on brief), for plaintiff in error.

*John R. Alderman, Special Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

CochRAN, J., delivered the opinion of the court.

John Turnbull, a/k/a George Waggener, was tried by a jury on November 25 and 26, 1974, on two indictments charging him with the abduction[1] and murder of Sandra Harrell Jones. Found guilty of the abduction and of murder in the first degree, Turnbull appealed the judgment order of the trial court, entered November 26, 1974, on the jury verdict, sentencing him to confinement in the State penitentiary for 30 years on each charge.

We awarded Turnbull a writ of error limited to the questions whether the evidence was sufficient to support his conviction on each charge, and whether the trial court erred in ruling that James Tolley, a witness for Turnbull, was incompetent and in subsequently denying Turnbull's motion for a mistrial.

On May 25, 1973, at about 8:00 a.m., the badly beaten body of Sandra ("Sandy") Harrell Jones was found beside a farm road in a wooded area of Southampton County. The medical examiner testified that in his opinion Sandra's death was caused by strangulation and that she died between 5:00 p.m. May 24 and 5:00 a.m. May 25.

The principal witness for the Commonwealth was Pamela ("Pam") Blair, who testified that she had pleaded guilty to the abduction and murder of Sandra in Southampton County. The witness related the sordid events in detail. On May 22, 1973, she and James Tolley accompanied Sandra and Turnbull ("Mongoose") to an office building in downtown Norfolk, where Sandra had been employed. Turnbull threatened Sandra with a wrench before she went into the building for her pay check and struck her in the mouth with the back of his hand when she returned without the check. They proceeded to Sandra's apartment, but the check had not been delivered. Sandra promised to pay Turnbull from her earnings as a dancer at the Jolly Roger, an Ocean View restaurant and night club, and Turnbull

---

[1] Turnbull was indicted for abduction under Code § 18.1-38 (Repl. Vol. 1960) which provided:

"Abduction with the intent to extort money, or pecuniary benefit . . . shall be punished with death, or by confinement in the penitentiary for life or any term not less than three years."

Abduction without the intent specified in Code § 18.1-38 was subject to less severe punishment under the provisions of Code § 18.1-37 (Repl. Vol. 1960).

warned her that she had better do so because "she couldn't rip him off".

On May 24, Pam testified, Turnbull was angry with Sandra over the money and said that "she had ripped him off". He also said that he had found out the day before that Sandra had been informing on the activities of the Pagans, the motorcycle gang of which Turnbull was the leader. Pam saw Sandy in an old maroon Mustang with Linda Grant and June Reed at a service station in the Ocean View section of Norfolk frequented by Pagans and their women. Turnbull ordered Linda "to do what he told her to do, and go teach Sandy a lesson". Linda, June, and Pam then took Sandra to an apartment where Linda brutally beat her with a belt and cut off her hair. The four returned to the service station around 3:00 p.m. Turnbull directed Linda to take Sandra to Georgia and "if she didn't make it along the way to just drop her off somewhere". Pam's testimony was that Turnbull amplified this command by saying, "I mean I don't want her to make it" and directing that Linda should "be sure to burn her hands and face so she can't be identified".

With Linda driving, the three girls transported Sandra to Southampton County where, Pam testified, Linda killed Sandra and left her body lying by the side of a dirt road in a remote wooded area. On the way out the car became stuck in a mud hole. The girls found two local men to whom they paid $15 each to pull the car out and then rejoined Turnbull and the others at a motel in Norfolk. When Linda reported that Sandra had been killed in accordance with his instructions, Turnbull expressed his pleasure.

George Edwards testified that he and a neighbor helped three girls, whom he identified as Linda Grant, June Reed and Pam Blair, by pulling their car out of a mud hole in a woods path in Southampton County, on May 24 at approximately 11:30 p.m. Suspicious of the circumstances he wrote down the license number of the car. The next morning he returned to the area and discovered Sandra's body some 300-400 yards from the place where the car had been stuck.

William Woods, a convicted felon and former Pagan, testified that at the time of Sandra's murder he was aiding State Police undercover narcotics agents as an unpaid informer. He described the organization of the Pagans and the status of their "old ladies", the women with whom they lived. An "old lady" customarily wore a "property patch" which identified her as the "property" of a Pagan. Some of the Pagans worked, and others were supported by their "old ladies". Dur-

ing the time that Woods belonged to the Pagans, Turnbull never worked at a regular job. Woods testified that Sandra was Turnbull's "old lady" at one time, that Pam and June Reed were James Tolley's "old ladies", and that Linda, known as "Crazy Linda", was Josie Green's "old lady". Turnbull was President of the Virginia Beach Chapter of the Pagans and was also over the Norfolk and Portsmouth Chapters, "and anything they said had to be checked over with him before anybody could do anything".

On May 24 at about 4:30 or 5:00 p.m., Turnbull, Tolley and Green came to Woods's apartment, and Turnbull advised Woods to have an "airtight" alibi for that night. Tolley explained that "they were going to get rid of Sandy", and Turnbull told Woods to say, if he was asked, that when he had last seen Sandy, she and another girl were hitchhiking from Norfolk toward Georgia to work as topless dancers. Woods promptly communicated this information to Jim Smith, an undercover agent of the State Police Narcotics section, and he and Smith looked for Sandra for about eight hours. On the following day Woods saw Sandra's I.D. card in a pocketbook which Tolley burned behind the service station at Ocean View.

After Sandra's body was found, Woods attended a meeting of the Pagans at which Turnbull said that he was going to be picked up for questioning about Sandra's death. He also said, "I must have been a dumb ass to try to let Crazy Linda try to take care of anything for me", since Sandra had been taken toward Suffolk instead of to Georgia, and nothing had been done to keep her body from being identified.

Woods further testified that Turnbull told him that Sandra was supposed to be paid $60 for dancing but that, after she stopped living with him, every time he went after the money she "would duck out the back door" instead of giving him the money to get his motorcycle out of the shop. Turnbull also told Woods that when the girls picked Sandra up they intended only to beat her up, but they beat her so badly that he was afraid she would die anyway, so he told them to take her "towards Georgia".

Other witnesses for the Commonwealth substantiated portions of the testimony of Pam Blair and Woods. Mrs. Judy Edwards recalled seeing Sandra, shortly before her death, evade Turnbull by going out one door at the Jolly Roger as he came in another. James Thorpe testified that Pam and three other girls in an old maroon Mustang stopped at his service station in Hampton on the night of May 24.

Trooper James Smith, of the State Police, confirmed that Woods had reported to him the threat against Sandra on May 24 and that he and Woods had tried in vain to find her throughout that evening until about 2:00 a.m. on May 25.

After his motion to strike the Commonwealth's evidence had been denied, Turnbull, testifying in his own defense, denied any knowledge of Sandra's abduction, beating or murder. He also denied that he had ever threatened or struck her, denied that he saw her on May 24, and denied that he talked to Woods on that day. He admitted, however, that Sandra owed him $30 to repay a loan that he made to her in April, and that she might have been afraid of him because of this unpaid debt.

■■ Viewing this evidence in the light most favorable to the Commonwealth, we hold that it is sufficient to support Turnbull's conviction on both charges as an accessory before the fact. There was ample evidence that Turnbull ordered the abduction, the beating and the murder. Sandra owed him money, and Turnbull had threatened her, struck her, and pursued her in vain efforts to obtain payment. He ordered her taken to an apartment and beaten to teach her that she could not "rip him off". The jury could reasonably have inferred that Turnbull not only wanted to punish her but also wanted to make certain that she would repay his loan and would not thereafter withhold money from him, thus bringing the abduction within the provisions of Code § 18.1-38 (Repl. Vol. 1960).

The jury could have found from the evidence that, after the Grant woman, aided and abetted by June and Pam, had beaten Sandra too severely, Turnbull, believing that she would die anyway, ordered that she be transported out of the state and murdered. The evidence is thus sufficient to show wilful, deliberate, and premeditated killing, which, under the provisions of Code § 18.1-21 (Cum. Supp. 1975), constitutes murder in the first degree. *See Bailey* v. *Commonwealth*, 191 Va. 510, 516-17, 62 S.E.2d 28, 30-31 (1950).

The evidence does not show that Turnbull personally abducted or beat Sandra or that he was present when she was murdered. It is sufficient, however, to show that he planned and instigated the commission of the crimes and was, therefore, an accessory before the fact. *Foster* v. *Commonwealth*, 179 Va. 96, 99, 18 S.E.2d 314, 315 (1942). *See Tolley* v. *Commonwealth*, 216 Va. 341, 348, 218 S.E.2d 550, 555, this day decided. Under the provisions of Code § 18.1-11 (Repl. Vol. 1960), an accessory before the fact "may be indicted, tried and convicted and punished in all respects as if a principal in the first degree . . . ."

■ Turnbull has challenged the rulings of the trial court that his witness, James Tolley, was incompetent, that Tolley's testimony should be stricken, and that Turnbull was not thereby entitled to a mistrial.

Tolley, who had previously been convicted of Sandra's abduction, was the principal defense witness other than Turnbull himself. Tolley testified extensively on direct examination. He described the strict domination that the members of the Pagans exercised over their respective "old ladies". He suggested that Linda, June and Pam were jealous of Sandra, who was a "honey" (a female follower of the Pagans, inferior to an "old lady" and available to all members of the gang), and angry with her because she had been engaging in sexual intercourse with each of their "old men", including Tolley. Tolley asserted that Turnbull was with him at the service station in Ocean View throughout the afternoon of May 24; that Linda, June and Pam drove in and wanted to go to Florida; that he did not see Sandra in the car; that the girls stayed only a few minutes and drove away around 3:00 or 3:30 p.m.; and that he and Turnbull remained at the service station until 6:00 p.m. and then visited bars until nearly 2:00 a.m. the next morning.

On cross-examination Tolley denied that he and Turnbull had gone to Wood's apartment on May 24, and denied that Turnbull had ever made any statements about beating or murdering Sandra or making certain that her body could not be identified. Tolley described the muddy appearance of the three girls when they returned to Norfolk early in the morning of May 25. Tolley admitted that Linda reported that she had burned Sandra's face and hands to prevent identification, but he insisted that Turnbull was asleep on the floor and had no conversation with her.

At this point in his cross-examination the Commonwealth Attorney undertook to impeach Tolley with a letter purportedly written to Pam Blair. Tolley refused to admit or deny that he had written the letter and testified that he could not say that the handwriting was his. Out of the presence of the jury the questioning continued and the Commonwealth Attorney asked the trial court to warn the witness of the penalties for perjury and announced his intention to seek a perjury indictment against Tolley if Tolley denied that he wrote the letter. Tolley then stated that he would answer no more questions for either side.

The trial court asked Tolley whether he had trouble remembering. The witness replied that he had "a lot of trouble remembering"; that he had been in a mental hospital the preceding year; that he remembered a few things that happened eighteen months before (about the time of Sandra's abduction and murder), but could not remember others; that he sometimes blacked out for perhaps two hours and could not remember what he did; that he had asked to see a neurosurgeon but had not been permitted to do so; and that the doctor would not give him the pills he needed for headaches and his "nerves have almost been shot too". This final colloquy ensued:

"The Court: You can't remember anything about Sandy Harrell Jones and about her death, or anything surrounding that?

"James Tolley: I don't remember nothing.

"The Court: Did you remember anything about it a few minutes ago when you were testifying?

"James Tolley: I don't know. I don't even know if I testified or not."

The Commonwealth Attorney contended that he was still entitled to question Tolley about the letter, and represented to the court that Pam Blair would identify it.

The record indicates that the court then called counsel to the bench for a conference but there is no record of what transpired. At the conclusion of the conference counsel for Turnbull stated that his motion for a mistrial, based upon surprise at Tolley's last testimony, had been overruled. The jurors were brought back to the courtroom and the trial court informed them that he had found, after examining him, that Tolley was not competent to testify. The court thereupon directed the jury to disregard Tolley's testimony, and ordered that the testimony be stricken from the record.

It is the function of the trial court to determine whether a witness is competent, that is, whether the witness possesses such understanding as to remember events and a knowledge of right and wrong. *Helge* v. *Carr*, 212 Va. 485, 487-88, 184 S.E. 2d 794, 796 (1971); *Coleman* v. *Commonwealth*, 66 Va. (25 Gratt.) 865, 874-75 (1874). *See* McCormick on Evidence, 2d Ed., § 62, p. 140 (1972). In making this determination the court may, but is not obligated to, consider the opinion evidence of experts. It is a matter within the discretion of the trial court. *Lewis* v. *Commonwealth*, 193 Va. 612, 624, 70

S.E.2d 293, 300-01 (1952). Here, there was evidence to support the trial court's finding that Tolley was not competent, and we hold that there was no error in this ruling or in the instruction to the jury to disregard Tolley's testimony.

Turnbull strenuously maintains, however, that he was entitled to a mistrial when Tolley's testimony was taken from the jury. We do not agree.

The trial court may discharge a jury when "there is a manifest necessity for such discharge". Code § 8-208.23 (Cum. Supp. 1975). There is no general rule as to what facts and circumstances constitute such a necessity but the trial coutr is authorized by the statute to exercise its discretion in making the determination according to the circumstances of the case. *Washington* v. *Commonwealth*, 216 Va. 185, 217 S.E.2d 815 (1975); *Mack* v. *Commonwealth*, 177 Va. 921, 927, 15 S.E.2d 62, 65 (1941). *See United States* v. *Wilson*, 95 S.Ct. 1013, 1022, n. 12 (1975).

We find no clear abuse of discretion by the trial court in denying Turnbull's motion for a mistrial. The record does not reflect the discussion between court and opposing counsel when the motion for a mistrial apparently was first made. The mere fact that Turnbull's counsel was surprised at Tolley's loss of memory does not entitle him to a mistrial as a matter of law. The trial court might have concluded that in the exercise of reasonable diligence Turnbull's counsel should have anticipated that Tolley would suffer lapses of memory at trial, in which event he could not claim surprise. *See State* v. *Henson*, 290 Mo. 238, 234 S.W. 832 (1921). Moreover, we will not consider whether, by failing to produce the letter which caused Tolley's loss of memory to be revealed, the Commonwealth failed to respond adequately to Turnbull's pretrial motion for discovery, since Turnbull did not raise this issue in the trial court. Rule 5:7.

There were other potential witnesses that might have been called by Turnbull. His counsel, however, did not seek a recess or a continuance for that purpose. The trial court, therefore, would have been justified in concluding that no other witnesses would testify in a manner favorable to Turnbull.

We hold that there was no reversible error in the rulings of the trial court and the judgment order is

*Affirmed.*

COMPTON, J., dissenting in part.

The majority has decided that the trial court, in declaring the witness Tolley incompetent to testify, did not abuse its discretion. I disagree.

I am convinced from a review of the record that, although Tolley was thoroughly impeached during cross-examination, the evidence is insufficient to support a finding that he was a legally incompetent witness. In my view, the question was one of credibility, a matter for the jury to evaluate, and was not a question of competency to be decided as a matter of law by the trial court, especially since the result of the trial court's action, now approved by this Court, eliminated from the jury's consideration the entire testimony of the defendant's principal witness. This was a clear abuse of discretion by the trial court.

In view of the cases relied on to support its opinion on this point, the majority apparently has found the evidence sufficient to support the conclusion that Tolley was untrustworthy as a matter of law because he was *mentally incompetent*.[1] Yet the "evidence" on which the trial court apparently relied, and on which my brethren now rely, came from Tolley, the very witness now declared to be unworthy of belief.

But aside from this, the record demonstrates to me that Tolley suffered a convenient "loss of memory," as the majority characterizes his state, when pressured during cross-examination. A sudden "loss of memory" by a witness is not an unusual development in the trial of a case, particularly when a vigorous cross-examination is conducted.

In this case, Tolley had testified at length and succinctly during direct examination by defendant's counsel. Then Tolley answered in excess of 60 questions propounded by the Commonwealth's Attorney during cross-examination before he was asked about a prior written statement, purported to be a letter to Pamela Blair, which was presumably inconsistent with his testimony. The following then transpired:

"CONTINUING BY MR. GRIZZARD [Commonwealth's Attorney]: Q. Would you look at that letter again and tell this Court and this jury whether you wrote it.
"A. I can't say whether I wrote it or not. It don't have my signature on it.

---

[1] In *Helge v. Carr*, 212 Va. 485, 184 S.E.2d 794 (1971), the witness Estes was mentally deranged, according to medical testimony, and her deposition was excluded as evidence. In *Coleman v. Commonwealth*, 66 Va. (25 Gratt.) 865 (1874), it was argued that the witness Mavo was a lunatic and hence incompetent.

"Q. Are you denying that you wrote this letter.

"Mr. Decker [defendant's attorney]: He said he can't tell whether he wrote it or not.

"A. It don't have my signature to it. I don't know whether I wrote that letter or not.

"Q. Is that your handwriting?

"A. I can't tell.

"Q. You don't know your own handwriting?

"A. No, I don't.

"Mr. Grizzard: If it please the Court, we had better send the jury out again because this witness needs to be warned.

"Mr. Decker: In front of the jury I object to that, that is highly improper.

"The Court: All right, ladies and gentlemen, will you step out to the jury room please.

"Jury Members Leave Courtroom.

"Mr. Grizzard: I would ask that the witness be given a few minutes to glance at the contents of this letter, and I will ask him again if he wrote it.

"Mr. Decker: Well before he is given a few minutes to look at it and so forth, and before he is warned, and he can have any warning you want and I don't know what he is going to testify to, and I don't know his handwriting, but he says it is not signed, and I don't recognize this as my handwriting. He has made the statement and if Mr. Grizzard wants to warn him let him go ahead and give the warning.

"The Court: Let me see the letter. The simplest way to handle this is to let the witness see the letter and read it and certainly he will know after he reads it whether or not it is his letter or not. If he wrote it, let him read the letter.

"Mr. Grizzard Continuing: Q. Read this letter please. Now I am asking you if you wrote that letter.

"A. I am going to say that I don't remember writing that letter.

"Q. This is not your handwriting?

"A. I can't say it is. It looks like my handwriting but a lot of it don't look like mine.

"Q. Did you write this letter to Pam Blair?

"A. I don't remember writing no letter to Pam Blair, not that letter anyway.

"Q. And you are denying this is your letter?

"MR. DECKER: He said he did not deny it, and he said he didn't remember writing it.

"MR. GRIZZARD: I am asking whether or not he wrote this letter. This business about I don't know is not good enough.

"A. When I sign a letter, I do not sign it that way.

"THE COURT: Did you read the contents of the letter?

"A. I read it and I read the contents and it don't make no sense to me. Black Knight got busted up for a different reason than what that says.

"MR. GRIZZARD CONTINUING: Q. All I am asking you is did you write this letter.

"A. I don't remember writing that letter.

"Q. Are you denying writing it, and I am entitled to a yes or no answer, and then you will have a warning of what the law is.

"A. I can't give a yes or no answer, because a lot of times I say and do things I don't remember. I have been seeing the doctor down here and I was in that mental hospital last year and I do things I don't remember, and I cannot give an answer to that.

"THE COURT: You can't remember whether or not you wrote a fourteen page letter or however long it is?

"A. No, I can't remember it.

"MR. GRIZZARD: I would ask the Court to warn the witness as to the penalties for perjury in this case.

"MR. DECKER: Your Honor, I don't think that this is in order at this time. As I say his lawyer is not here and I am not his lawyer, but on the other hand, I did call him as a witness and I think he has stated he doesn't remember, and I haven't said one word to him since that letter first came out, nor has my partner, Mr. Christie, and I don't know anything about the motivation for his answer, but I do know this; he has answered the question and he says he doesn't remember it and it has not been properly identified for entry into evidence, and he cannot be examined on it.

"A. My name is James Tolley.

"MR. GRIZZARD CONTINUING: Q. Do you sign all of your letters James?

"A. Most of the time Jim or James.

"Q. And Jimmy?

"A. Occasionally I have, yes.

"MR. GRIZZARD: I am going to ask the Court to warn him what the penalties of perjury are because unless he is advised, I think we

would be taking him to advantage, and if he keeps denying he wrote that letter, the Commonwealth intends to bring a perjury indictment against him.

"MR. DECKER: He did not deny it.

"MR. GRIZZARD: He did not give a yes or no answer.

"MR. DECKER: He says he can't remember. The Commonwealth says to answer the question and he answers it, and then he brings a perjury indictment.

"JAMES TOLLEY: I am not answering no more questions in this Court. I am finished with it right now. I will not answer another question in this Court as far as the defendant or the prosecution either one. I quit right now. If you want to give me a charge of perjury, give it to me.

"THE COURT: Are you asking us to tell the jury to disregard everything you have said?

"JAMES TOLLEY: I don't care what you tell the jury. I tried to tell you that I don't remember writing the letter and everything and he is going to bring charges on me and everything else. What can I do?

"THE COURT: Do you have a little trouble remembering?

"JAMES TOLLEY: Yes, I have a lot of trouble remembering. See the doctor down here whenever they take me, and I was in the mental hospital last year because I can't remember what I do sometimes.

"THE COURT: Can you remember anything that happened back eighteen months ago?

"JAMES TOLLEY: Yes, I remember a few things that happened eighteen months ago, but some things I don't remember. Sometimes I have spells I black out for maybe two hours or something and I don't know what I am doing in those two hours or something or other. I have asked to see a neurosurgeon since I have been down here for eleven months, and I haven't got to see one to find out why this is, and I still haven't got to see one and the doctor won't give me the pills I need for headaches or anything else and my nerves have almost been shot too, and I tried to tell the truth and then they bring this stuff like this that I don't know nothing about, and I can't recognize it anyway, and I don't remember doing it.

"THE COURT: What do you remember about this whole situation?

"JAMES TOLLEY: Right now, I don't remember nothing."

It was on the strength of this testimony, and that quoted in the majority opinion, that the trial judge declared Tolley incompetent, telling the jury:

> "Ladies and gentlemen of the jury, I have examined the witness who just testified, and after examining this witness I find that he is not competent to testify in this case. I will ask that you disregard any statement that he may have made in this courtroom during this trial. Anything this witness may have said will not be considered by you when you arrive at your verdict in this case. I will ask that his entire testimony be stricken from the record."

The foregoing incident of trial merely reveals a case wherein a witness has been totally impeached and, upon being threatened with indictment for perjury, has further discredited himself by stating that: "Right now, I don't remember nothing." But this circumstance did not authorize elimination of the discredited testimony from the jury's consideration. I feel, therefore, that the action of the trial court was not justified by the evidence and was an abuse of discretion. For this reason, I would reverse the judgment of conviction and remand the case for a new trial.[2]

---

[2]Under certain circumstances, if a witness refuses to answer pertinent questions upon cross-examination, his direct testimony may properly be stricken. But this settled procedure is based on "the common law rule that no evidence should be admitted but what was or might be under the examination of both parties", *Citizens Bank & Trust Co.* v. *Reid Motor Co.*, 216 N.C. 432, 434, 5 S.E.2d 318, 320 (1939), and not on the incompetence of the witness to testify.