COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Frank and Senior Judge Overton
Argued at Chesapeake, Virginia


JOSEPH WALTER NOBREGA

                                              MEMORANDUM OPINION* BY
v.         Record No. 0511-04-1                JUDGE JAMES W. BENTON, JR.
                                                        MAY 10, 2005
COMMONWEALTH OF VIRGINIA


               FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                           Charles D. Griffith, Jr., Judge

           S. Jane Chittom, Appellate Defender (Virginia Indigent Defense
           Commission, on briefs), for appellant.

           Eugene Murphy, Assistant Attorney General (Jerry W. Kilgore,
           Attorney General, on brief), for appellee.


       The trial judge convicted Joseph Walter Nobrega of two counts of rape of a child under

the age of thirteen and two counts of sexual abuse of a child under the age of thirteen over whom

he maintained a custodial or supervisory relationship.  Nobrega contends the trial judge (i) "erred

by denying [his] motion for an independent psychiatric [or] psychological examination of the

[child]" and (ii) erred in finding the evidence sufficient to sustain the convictions.  For the

reasons that follow, we affirm the judgment.

                                              I.

       Four indictments charged that, on two occasions between March 1, 1998 and September

30, 2000, Joseph Walter Nobrega engaged in sexual intercourse with his daughter, a child under

the age of thirteen, in violation of Code § 18.2-61, and that on two occasions between those same

_____

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

dates Nobrega "knowingly and intentionally, with lascivious intent," sexually abused his daughter, a child under the age of thirteen, in violation of Code §§ 18.2-370.1 and 18.2-10.

Prior to trial, Nobrega moved for an independent psychological or psychiatric examination of the child. He alleged that she "has long-standing emotional and mental health issues and has been under the care . . . of numerous psychiatrists, psychologists and clinicians." In part, the motion continues as follows:

> 4) That presently there is not a current, accurate and independent psychological and/or psychiatric examination of [the child];
>
> 5) That mental health and instability of [the child] is a crucial factor in the defense of the accused;
>
> \* \* \* \* \* \* \*
>
> 7) That it is vital to defendant's defense to have an independent psychiatric/psychological examination of [the child] completed, or in the alternative have a child psychiatrist/psychologist review the psychiatric records of [the child] given the seriousness of the charges . . . .

At the initial hearing before the trial judge, Nobrega's attorney argued that "this case really hinges on this little girl's testimony and her mental and emotional state of mind" and that the concern was the child's "suggestibility" flowing from her psychiatric disabilities. The prosecutor argued "that the effect of having this expert witness would, in essence be a commentary of the victim's credibility." The trial judge permitted both parties to file memoranda before he ruled on the motion.

Nobrega's attorney filed a memorandum alleging that the child's "capacity to differentiate between the real and the imagined is . . . a central issue in the case" and that the "examination is not for the purpose of addressing the ultimate issue . . . , but rather to determine [the child's] capacity to differentiate reality from imagination and her susceptibility to outside influences." Attached to the memorandum as exhibits are documents and medical records indicating that the child began receiving treatment at an early age by psychologists and

- 2 -

psychiatrists and that she has had a long history of serious mental illness. At age three, the child was diagnosed with attention deficit/hyperactivity disorder but did not begin taking stimulant medication as a treatment until the first grade. By the third grade, she threatened suicide and threatened to kill people. For a period of two years, she was treated for bipolar disorder and took a number of prescribed psychoactive drugs, including Trazedone, Depakote, Lithium, Effexor, and Adderall.

In September 1999, at age eight, the child was admitted to a hospital because of suicidal ideation. The examining psychiatrist reported that the child was having "periodic auditory hallucinations, that she thought she heard God's voice, and [that] her thought processes included a grandiose flight of ideas." She was diagnosed as having "Bipolar Disorder, Manic" and again with "Attention Deficit/Hyperactivity Disorder." Seven months after her release, the child was again admitted to the hospital. She reported having visual hallucinations that her father shot her mother and then her. She also believed she "heard a mermaid who turned [her] into a mermaid." At her discharge, a psychiatrist diagnosed her with "major depressive disorder, with psychosis."

In July 2001, a school psychologist referred the child for a psychological assessment. The evaluation report indicates that the child was "prone to distorted perceptions of people and events around her" and that there was "clear evidence of significant emotional and behavioral maladjustment." The report indicates she also had episodes of anger so severe that at times she had to be physically restrained.

In response to these documents, the Commonwealth contended in its memorandum that the purpose for which Nobrega seeks "the examination is to address whether [the child's] accusations are based in fact or whether they are imputed through outside influences, [which] is exactly the ultimate issue, namely the credibility of the [child] victim." The memorandum

asserted that the child's "competency is not an issue and such independent psychiatric testimony would only serve to impeach her veracity."

At a later hearing, Nobrega's attorney argued "that this really is a competency issue, . . . competency for her to testify . . . . And we are requesting an independent psychological examination . . . as . . . a test of her competency." She argued that the medical reports indicate the child "has a significant problem with reality testing and prone to distorted perceptions" and that the child's "auditory and visual hallucinations" are manifestations of her lack of competency. Neither the motion nor the memorandum had made a direct reference to the child's competency to testify as a witness. The trial judge denied the motion, ruling as follows:

> This just doesn't fit into what the Court ought to do. . . . [W]hat you ultimately are asking, whether you call it competency or credibility, is you are asking me to permit you to have an expert who would usurp the authority of the Court whose responsibility it is to make preliminary determinations of competency for people to testify and ultimately the fact-finder to determine the credibility of a person.

> Even if I appointed such an expert to conduct such an examination, the ultimate end result for it to have any impact or effect on the outcome of the trial would be for that person to testify. And that person would not be qualified to testify because they would ultimately be testifying to an ultimate issue and determination for the fact-finder of the court in making determinations to the competence of a particular witness to testify.

> And since that person can't do that, it makes no sense for the Court upon your request to require their independent examinations. Otherwise, upon such representation, in almost any case where there's an eyewitness or one on one, the Court would have to have someone submit to examinations for some expert to ultimately come into the courthouse and say this person is not competent to testify. This person is not worthy of credibility. And we're not going there in our justice system. We haven't gone there, and we're not going there. And so I'm going to deny your motion.

At trial, the evidence proved the family lived on Farrell Avenue until March of 1999 and then on Randall Avenue until October 2000. The child testified that the first incident occurred

when she was seven and while the family lived on Farrell Avenue. When her mother was at work, Nobrega gave her a white gown, told her not to wear underwear, and directed her to her mother's bed. In the bedroom, Nobrega put a bandana over her eyes and put his penis in her vagina. Nobrega then rubbed her head until she fell asleep. He told her he would kill her if she ever told anyone about the incident. She also testified that when her mother returned she told her mother she was bleeding and that her mother responded it "is part of growing up."

The child testified that the second incident occurred just prior to her ninth birthday on Randall Avenue. Nobrega told her to change into a white gown. In her mother's bed, he again put a bandana over her eyes and inserted his penis in her vagina. She testified Nobrega again rubbed her head until she fell asleep and said he would kill her if she spoke about what had happened. She testified this incident occurred before February 2000, when an accident incapacitated Nobrega.

In November 2002, the child, then eleven years old, told her mother Nobrega had raped her. A physician testified he examined the child in December 2002, found that her "genital area was normal," and saw nothing suggestive of either current injury to the genital area or a previous injury. He explained there might well be no symptoms or injuries from a prior sexual incident due to various factors: depth of contact, extent of trauma, development of the child, healing that occurred before his examination, and other factors.

In motions to strike the evidence, Nobrega's attorneys argued, in part, that the child gave inconsistent and incredible testimony, but did not argue that the child was incompetent to testify. At the conclusion of the evidence, the trial judge ruled that the child was a credible witness and convicted Nobrega of each of the four charged offenses.

On appeal, Nobrega contends that, as an indigent defendant, he had a due process right to have an expert appointed to examine the child and "to assist the Court to determine [the child's] competence to testify." He argues that the child's competence was a significant factor at trial, that he had a particularized need for this evaluation, and that he was prejudiced without the expert's evaluation.

In denying Nobrega's motion, the trial judge based his ruling on three factors. He first concluded the expert would usurp his authority to make the determination of the child's competence. This ruling is contrary to case decisions. "[T]he competency of the witness . . . depends on his capacity accurately to observe, remember, and communicate facts." Hopkins v. Commonwealth, 230 Va. 280, 291, 337 S.E.2d 264, 271 (1985). The Supreme Court has explained the trial judge's role in this matter as follows:

> It is the function of the trial court to determine whether a witness is competent, that is, whether the witness possesses such understanding as to remember events and a knowledge of right and wrong. In making this determination the court may, but is not obligated to, consider the opinion evidence of experts. It is a matter within the discretion of the trial court.

Turnbull v. Commonwealth, 216 Va. 328, 334, 218 S.E.2d 541, 546 (1975) (citations omitted). In other words, although the trial judge must make the final determination whether a witness is competent to testify, the trial judge is authorized to consider expert testimony and has discretion in weighing experts' opinions. Thus, if a trial judge rules a witness incompetent to testify based on expert testimony, that ruling will be deemed "a considered judgment" that is supported by credible evidence. Helge v. Carr, 212 Va. 485, 491, 184 S.E.2d 794, 796 (1971).

The trial judge also ruled: "Even if I appointed such an expert to conduct such an examination, the ultimate end result for it to have any impact or effect on the outcome of the trial would be for that person to testify . . . and say [the child] is not competent to testify." He

apparently drew this conclusion from Nobrega's attorney's argument that "if [the child] is found competent," the expert would be called to testify about the "suggestibility" of the child to influence due to her illness. Thus, the trial judge concluded the psychological or psychiatric expert's opinion necessarily would be an assessment of the child's credibility and was inadmissible.

Credibility is distinct from witness competence. "Credibility . . . goes to 'the quality or power of inspiring belief.'" United States v. Welsh, 774 F.2d 670, 672 (4th Cir. 1985) (quoting Webster's 3rd New International Dictionary 532 (1993)). See also Black's Law Dictionary 374 (7th ed. 1999) (defining credibility as the "quality that makes [someone] worthy of belief"). As we have noted, it is well recognized that the trial judge may consider expert testimony on the issue of witness competency. Helge, 212 Va. at 490, 184 S.E.2d at 797. It is equally well established that a party is not permitted to present opinion testimony regarding the credibility of a witness' testimony. James v. Commonwealth, 254 Va. 95, 98, 487 S.E.2d 205, 207 (1997). Thus, the trial judge clearly had the authority to rule inadmissible an expert's opinion regarding the child's credibility.

Nobrega's "suggestibility" argument is summarized in his memorandum as follows: "the expert testimony will not invade the province of the jury . . . but will merely aid the jury in appropriately weighing the [child's] testimony." Nobrega relies upon Pritchett v. Commonwealth, 263 Va. 182, 557 S.E.2d 205 (2002), where the defendant offered expert testimony about his mental retardation "to assist the jury in assessing the reliability of [the defendant's] confession, which conflicted with [the defendant's] trial testimony." Id. at 186, 557 S.E.2d at 207. The Supreme Court reversed the trial judge's exclusion of the evidence and held that the evidence was admissible to "assist the jury in determining whether the defendant's pre-trial confession was reliable." Id. Pertinent to Nobrega's claim in this case that the expert's

testimony would assist the jury in "appropriately weighing the [child's] testimony," the Court

ruled as follows in Pritchett:

> An expert witness may not express an opinion as to the veracity of a witness because such testimony improperly invades the province of the jury to determine the reliability of a witness. Fitzgerald v. Commonwealth, 223 Va. 615, 630, 292 S.E.2d 798, 806 (1982), *cert. denied*, 459 U.S. 1288 (1983). Dr. Herrick's broad statement that Pritchett "just went along with what they said" could be construed as an evaluation of the unreliability of Pritchett's confession and a comment on the truth of that part of Pritchett's trial testimony which differed from his confession. So construed, it was an inadmissible statement regarding Pritchett's veracity which the trial court correctly excluded as an invasion of the province of the jury. Coppola [v. Commonwealth], 220 Va. [243,] 252-53, 257 S.E.2d [797,] 803-04 [(1979)].

> But this Court has previously held that an expert may testify to a witness's or defendant's mental disorder and the hypothetical effect of that disorder on a person in the witness's or defendant's situation, so long as the expert does not opine on the truth of the statement at issue. Fitzgerald, 223 Va. at 629-30, 292 S.E.2d at 806; Coppola, 220 Va. at 252-53, 257 S.E.2d at 803-04.

Pritchett, 263 Va. at 187, 557 S.E.2d at 208. The record in this case does not clearly demonstrate

that an expert could not provide testimony as to the child's "mental disorder and the hypothetical

effect of that disorder" on the child. Id.; Fitzgerald, 223 Va. at 629-30, 292 S.E.2d at 806. The

trial judge's ruling therefore was erroneous.

Likewise, the trial judge mistakenly assumed that the "ultimate result" of appointing an

expert would be that the expert would testify about an ultimate fact in issue. It is undisputed that

courts prohibit expert testimony on an ultimate fact in issue. "Expert opinion on an ultimate fact

in issue is inadmissible in a criminal case because it 'invade[s] the province of the jury.' Such an

invasion implicates the due process and fair trial guarantees of the Constitution of the United

States." Jenkins v. Commonwealth, 254 Va. 333, 336, 492 S.E.2d 131, 132 (1997) (quoting

Llamera v. Commonwealth, 243 Va. 262, 264, 414 S.E.2d 597, 598 (1992)). In making his

ruling, however, the trial judge conflated competence and credibility, and he mistakenly based

his ruling on the belief that an expert's testimony regarding the witness' mental disorder would necessarily violate the prohibition on testifying to an ultimate fact in issue. As Pritchett and Fitzgerald hold, this is not always the case.

An abuse of discretion is "an adjudicator's failure to exercise sound, reasonable, and legal decision-making." Black's, supra at 10. Thus, a trial judge errs, "as a matter of law" when he "use[s] an improper legal standard in exercising [a] discretionary function." Thomas v. Commonwealth, 263 Va. 216, 233, 559 S.E.2d 652, 661 (2002). See also Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998) (holding that "'a trial court by definition abuses its discretion when it makes an error of law'"). We hold, therefore, that the trial judge misapplied the law in denying Nobrega's motion. This error was "'by definition'" an abuse of his discretion. Id. (quoting Koon v. United States, 518 U.S. 81, 100 (1996)).

The Commonwealth contends, however, that the trial judge had no authority to require the child to be examined. We agree, and we hold that the trial judge's denial of Nobrega's motion was not reversible error. The Supreme Court has held, in analogous circumstances, that a trial judge lacked authority to order an independent examination of a complaining witness. In Clark v. Commonwealth, 262 Va. 517, 551 S.E.2d 642 (2001), the Supreme Court answered negatively the "question . . . whether the circuit court erred in denying a defendant's motion 'requiring an independent medical examination of the complaining witness' in a statutory rape case." Id. at 518, 551 S.E.2d at 643. The Court rejected the defendant's claim of "due process rights" to "present evidence in his own defense" and to seek "exculpatory evidence." Id. at 520, 551 S.E.2d at 644. It held that the "motion to require the victim of the rape to submit to a physical examination . . . simply is a discovery effort." Id.

- 9 -

Essentially, Nobrega presents the same due process claims raised and rejected in Clark. The decision in Clark was not grounded in a reluctance to order an invasive procedure but, rather, was grounded in the lack of "authority . . . permitting such discovery." 262 Va. at 520, 551 S.E.2d at 644. We conclude that Clark requires us to hold that the trial judge in this case did not err in refusing Nobrega's request for an "independent psychiatric/psychological examination of the complaining witness" in this statutory rape case.

Nobrega cites as his authority for his due process claim Ake v. Oklahoma, 470 U.S. 68, 77 (1985) (holding that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an adequate defense"), and Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996) (similarly holding that an indigent defendant has a constitutional right to the appointment of an expert at state expense, when the defendant "can demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance" (quoting Ake, 470 U.S. at 82-83)). This "elementary principle," which Ake reiterates, is "grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness [and] derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." 470 U.S. at 76. The holding in Clark, however, applies equally to all defendants, regardless of wealth, and is premised upon the absence of a right under state law to obtain, pre-trial, from the complaining witness information that would assist the defendant at trial. The Supreme Court of Virginia put it succinctly:

> [I]f an accused in Virginia has no right to interview a rape case
> victim, and no right to discover statements made by
> Commonwealth's witnesses to agents of the Commonwealth, and
> no right to discover certain internal Commonwealth documents,

- 10 -

> surely the accused should have no right to a physical examination of the victim in a statutory rape case. And we so hold.

262 Va. at 521, 551 S.E.2d at 644.

In view of the Supreme Court's ruling in <u>Clark</u>, that the trial judge "lacked authority to order [a medical] examination" of a complaining witness in a statutory rape case, <u>id.</u> at 520, 551 S.E.2d at 644, we hold that the trial judge's denial of Nobrega's motion to order a psychiatric examination in this statutory rape case, albeit for incorrect reasons, was not reversible error.

### III.

Citing <u>Fisher v. Commonwealth</u>, 228 Va. 296, 321 S.E.2d 202 (1984), Nobrega acknowledges that a rape conviction can be sustained solely upon the child's testimony. He argues, however, that the conviction should be reversed because no physical or medical evidence supported the accusation and because the child's testimony was unreliable because of her mental illness, her delay in reporting the rape, and her inherently incredible testimony.

When as here, the convicted defendant challenges the sufficiency of the evidence to support the convictions, we view the evidence in the light most favorable to the Commonwealth, granting to that evidence all reasonable inferences that flow from it. <u>Higginbotham v. Commonwealth</u>, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The principle is well established that "[t]he trier of fact is the sole judge of the credibility of the witnesses, unless, as a matter of law, the testimony is inherently incredible." <u>Walker v. Commonwealth</u>, 258 Va. 54, 70-71, 515 S.E.2d 565, 575 (1999) (citation omitted).

Although the forensic medical expert, Dr. John DeTriquet, testified "there were no current findings suggestive of either current injury or any signs of a previous injury," he indicated the rapes could have occurred in such a way that there was no trauma to the tissues. He also said any injury could have healed during the nearly three years between the last rape and his examination of the child. He explained as follows:

- 11 -

> In my experience clinically -- and it is well documented in medical literature on patients - if there is an injury to the genital area - and in this instance, let's say it's the hymen . . . because of the changes that estrogen induces in the hymenal tissue, those estrogenal changes that naturally occur can remodel, obliterate, or normalize what previously was an injury or tear or what had been viewed as an injury or tear in the child, so it can change to normalcy.

From this evidence, we cannot say the judge erred when he concluded, as he did in this case, that the absence of forensic medical evidence showing that the child had been raped did not suggest the child's testimony was unreliable.

Nobrega also contends that the child's delay in reporting the rape, a period of two years, is "the hallmark of an unreliable accusation." Delays in reporting do not affect the admissibility of statements of past sexual abuse, but bear upon the weight the fact finder gives to the testimony. Lindsey v. Commonwealth, 22 Va. App. 11, 15, 467 S.E.2d 824, 826 (1996) (citing Pepoon v. Commonwealth, 192 Va. 804, 810, 66 S.E.2d 854, 858 (1951)).

> Thus, while the lapse of time between the alleged event and the report is certainly an issue, it is a question of weight rather than of admissibility. "[T]he accompanying circumstances must determine how far the delay has been successfully explained away."

Lindsey, 22 Va. App. at 16, 467 S.E.2d at 827 (citation omitted). Here, the child explained the delay, testifying about her father's threats that he would "kill her if she told." The trial judge sitting as fact finder specifically found credible the child's testimony that the triggering event, which caused her to tell her mother, was a passage the child read condemning sexual intercourse with a family member. As in Lindsey, "the issue of the two-year delay was one of credibility properly left to the trier of fact." Id.

Nobrega contends that the inconsistencies in the child's testimony suggest that her testimony was not worthy of belief.

> The fact that a witness makes inconsistent statements in regard to the subject matter under investigation does not render his

testimony nugatory or unworthy of belief. It is the province of the trier of the facts . . . "to pass upon such inconsistent statements and give or withhold . . . assent to the truthfulness of the particular statement." It is firmly imbedded in the law of Virginia that the credibility of a witness who makes inconsistent statements on the stand is a question for the jury, or for the trial court as a trier of the facts sitting without a jury.

Swanson v. Commonwealth, 8 Va. App. 376, 378-79, 382 S.E.2d 258, 259 (1989) (citation omitted).

The record does show inconsistencies in the child's testimony, such as whether her father ejaculated, whether he wore clothes, whether she could see her father's "private" with a bandana over her eyes, and the effect of her bleeding. However, considering the child's age, and the length of time that had passed, the trier of fact could find that inconsistencies were quite minor and did not render her testimony so inherently incredible or contrary to human experience as to make it unworthy of belief. As we explained in Swanson, the trial judge sitting as fact finder weighed these inconsistencies and deemed the child to be credible. 8 Va. App. at 379, 382 S.E.2d at 259. Because the judge's findings were not plainly wrong or without evidence to support them, we will not disturb them on appeal.

Nobrega further argues that the child's history of past hallucinations suggests that she fabricated the rape accusations due to her mental illness. The record contains the testimony of Dr. Lynn Zoll, a clinical psychologist who had examined the child in the past. When asked if she was aware of the child's hallucination that her father had shot both the mother and the child, Dr. Zoll testified that it was her "recollection that [the child] was afraid [Nobrega] would do that." She also testified that this could have been the result of post-traumatic stress disorder caused by the rapes. In finding Nobrega guilty, the trial judge specifically credited Dr. Zoll's testimony.

We cannot say the evidence was so incredible or so contrary to human experience as to render it unworthy of belief.  The trial judge's factual findings were supported by credible evidence and were not plainly wrong.  We therefore affirm the convictions.

<u>Affirmed.</u>