## CIRCUIT COURT OF WISE COUNTY

Commonwealth of Virginia

v.

William Jeffrey Cantrell

### Case No. F85-171

By JUDGE J. ROBERT STUMP

April 3, 1986

*Double Jeopardy*

William Jeffrey Cantrell was indicted (F82-50) in January, 1982 for the murder of his wife and the use of a firearm in the commission of murder. The first jury trial ended in a deadlock, and the court declared a mistrial. Cantrell was convicted in a second jury trial. But the Virginia Supreme Court reversed on grounds of special prosecutorial misconduct, and "remanded the cases for further proceedings. . . if the Commonwealth be so advised." *Cantrell* v. *Commonwealth*, 229 Va. 387, 398 (1985).

Prior to a third trial Cantrell filed a written motion to quash indictment. Cantrell presented the former Commonwealth's Attorney, J. Ray Dotson, as a witness on his motion to quash indictment and/or dismiss with prejudice. Dotson testified in effect that but for the influence of the special prosecutor he probably would not have originally presented the Cantrell case to the grand jury.

Cantrell argued strenuously and persuasively that the special prosecutor's influence on the former Commonwealth's Attorney was "sufficient to taint the indictment," and "this court should dismiss with prejudice." On his motion of double jeopardy Cantrell now argues differently that when he pled at the first trial, he waived any defects in the indictment, relying on Rule 3A:9(b)(1) and (c).

Immediately the present Commonwealth Attorney moved the court to "nolle pros this case based on the high probability of taint." Over strong objection by Cantrell, the trial court granted "a nolle pros," saying, "Certainly I think it is a serious taint on the trial." All of the above took place on the morning of the third trial before the jury was impaneled or sworn. Thereafter Cantrell was indicted (F85-171) by a new grand jury on the same charges. Cantrell now moves to dismiss indictment F85-171 on grounds of double jeopardy. Cantrell contends that jeopardy attached as soon as the jury in the first trial was impaneled and sworn; and that after the granting of a nolle prosequi, he cannot be retried on the new indictment.

The Commonwealth argues that jeopardy did not attach because the nolle prosequi was granted before the jury was impaneled or sworn prior to the third trial.

The general rule and great weight of authority requires that the jury must be impaneled and sworn before a person is in jeopardy. 2B M.J. *Autrefois, Acquit and Convict*; II. What Constitutes Jeopardy. § 4 p. 390.

In the first Cantrell trial a jury was impaneled and sworn, but then it deadlocked, and the court declared a mistrial. This result is properly provided by Virginia Code § 8.01-361, "the court may discharge the jury when it appears that they cannot agree on a verdict." *Turnbull v. Commonwealth*, 216 Va. 328 (1975); *Miller v. Commonwealth*, 217 Va. 929 (1977); and *Arizona v. Washington*, 434 U.S. 497, 54 L.Ed.2d 717, at p. 730 (1978). Certainly a retrial was proper to insure that society and Cantrell be granted one complete trial.

A jury was impaneled and sworn at the second Cantrell trial, and found him guilty. But on appeal the Virginia Supreme Court reversed and remanded for a retrial. Again there has been no complete trial. "Where there is a verdict . . . against a person which on appeal is reversed, when the case goes back, a nolle prosequi may be entered and

a new indictment may be found." 6A M.J. *Dismissal, Discontinuance and Nonsuit*, VII. Nolle Prosequi § 40 p. 201 and Virginia cases cited therein.

The Virginia Supreme Court did not dismiss the case, nor hold that jeopardy attached, but "remanded for further proceedings. . . if the Commonwealth be so advised." The legal effect is that the Cantrell case arrived back at square one as if there had never been a complete trial. The Commonwealth may move for nolle prosequi. Va. Code Section 19.2-265.3.

The U.S. Supreme Court said in *Bucolo* v. *Adkins*, 424 U.S. 641, 47 L. Ed. 2d 301, 96 S. Ct. 1086, "Nolle prosequi, if entered before jeopardy attaches, neither operates as an acquittal nor prevents further prosecution of the offense."

The Virginia Supreme Court said in *Miller, supra,* "Under Virginia procedure a nolle prosequi is a discontinuance which discharges the accused from liability on the indictment . . . For the prosecution to proceed thereafter for the same offense, a new indictment is required. *Dulin* v. *Lillard, Sheriff,* 91 Va. 718, 20 S.E. 821 (1895)."

The issue then is when may the court grant a nolle prosequi without running afoul of the double jeopardy rule. Here it was properly granted prior to the jury being sworn.

The case of *Miller* v. *Commonwealth,* 217 Va. 929 (April, 1977) controls the facts and the double jeopardy issue in the Cantrell case. Miller's two trials resulted in deadlocked juries and mistrials were ordered. Thereafter the Commonwealth Attorney moved to nolle prosequi which motion was granted over defendant's objections. Miller was subsequently reindicted on the same charges and convicted. The Virginia Supreme Court said at p. 934, "Finding nothing in the record to show the trial court abused its discretion in dismissing the jury when it concluded, in each instance, that the jury would be unable to reach a verdict, the jeopardy which attached at the beginning of each of the first two trials was dissipated, so we find no error in the overruling of the defendant's pleas of autrefois acquit and double jeopardy."

This court recognizes the subsequent U. S. Supreme Court case (relied on by Cantrell) of *Arizona* v. *Washington*, 434 U.S. 497, 54 L.Ed.2d 717, 98 S.Ct. 824 (1978), which established the "manifest necessity" rule required in granting a mistrial. But *Arizona* is distinguishable

on the facts from the *Cantrell* and *Miller* cases. However, the law in *Arizona* is applicable here. It is my opinion that *Arizona* did not overrule *Miller*.

In *Arizona*, defense counsel improperly commented on inadmissible evidence that may have affected the impartiality of the jury. The trial judge granted the prosecutor's motion for a mistrial on the second day of trial after extensive voir dire of prospective jurors (wherein the "poisoning of the panel" occurred), the jury was impaneled and sworn, and opening statements were made. The trial judge did not expressly find "manifest necessity" for a mistrial, but the Supreme Court found from the record that the judge exercised "sound discretion," and "acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding." The Supreme Court refused to dismiss defendant's case on grounds of double jeopardy.

Prior to the third trials in *Miller* and *Cantrell*, the jury was not impaneled nor sworn so jeopardy did not attach. In *Arizona*, the jury had been impaneled and sworn, so jeopardy did attach. But *Arizona* expanded the rule that jeopardy does not attach when it allowed the trial judge in his discretion to declare a mistrial, after finding "manifest necessity" expressly or based on the record, and after the jury is impaneled and sworn.

*Arizona* does not shine a new light on the law of the Commonwealth. The "manifest necessity" rule has been recognized as a basic theory appearing historically in Virginia's statutory and case law. Va. Code § 8.01-361; *Miller* v. *Commonwealth*, *supra*; *Rosser* v. *Commonwealth*, 159 Va. 1028 (1933); and *Turnbull* v. *Commonwealth*, 216 Va. 328, and other cases cited therein.

Since a jury was not impaneled nor sworn prior to the third Cantrell trial, the facts of *Arizona* are inapplicable. But even so this court finds (in the form of dicta) that the "manifest necessity" rule has been complied with in the Cantrell case.

This court will not presume to know what would have been the decision of the original trial judge, or the Virginia Supreme Court, if the case had been appealed. But Cantrell argued that the special prosecutor influenced the former Commonwealth Attorney to present the Cantrell case to the first grand jury. The trial judge did not abuse his discretion in granting the nolle prosequi. Can-

trell, the Commonwealth Attorney and the court were convinced that this "taint" was a serious problem, more especially in view of the Virginia Supreme Court's reversal opinion. This court further does not find any prosecutorial "bad faith conduct," but finds that he acted in good faith to the protection of Cantrell's interests.

Now Cantrell inconsistently contends that he waived this "tainted" defect. But he cannot be relieved from the consequences of his voluntary choice, nor blow hot and cold. In *Harris v. Commonwealth*, 222 Va. 205 (1981), the defendant argued "there was no manifest necessity for aborting the first trial because there were other alternatives available to the court to cure the apparent jurisdictional flaw." But the Virginia Supreme Court held that "because the defendant moved during that proceeding to have the case remanded to the juvenile court for trial, the Double Jeopardy Clause does not bar his second trial on the same charges."

At p. 211 of *Harris*, the court said, "When a defendant successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution. *United States v. Scott*, 437 U.S. 82, 93 (1978). Such action by a defendant is considered to be a 'deliberate election on his part to forego his valid right to have his guilt or innocence determined before the first trier of fact.' Id. See *Jones v. Commonwealth*, 220 Va. 666, 672, 261 S.E.2d 538, 542 (1980) (concurring opinion)."

"Furthermore, the record clearly demonstrates that the mistrial was granted solely to protect defendant's interests. Under such circumstances, a second prosecution is not barred under double jeopardy principles. 'Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant to hold that its necessary consequence is to bar all retrial.' *Gori v. United States*, 367 U.S. 364, 369 (1961)."

Wherefore, the court finds that jeopardy which attached at the beginning of each of the first two trials was dissipated and did not attach prior to the third trial when the jury was not sworn. Cantrell's motion to quash on grounds of double jeopardy is overruled.

April 9, 1986

*Fruit of the Poisonous Tree Issue*

*Preliminary Procedures*

After deputy sheriffs initially secured the Judy Cantrell murder scene, they later returned without a warrant and seized other evidence. William Jeffrey Cantrell's motion to suppress this evidence was sustained by Judge M. M. Long, Jr., during a pretrial hearing on indictment F82-50.

The United States Supreme Court has expressly declined to establish a "murder scene exception" to the warrant requirements of the Fourth and Fourteenth Amendments. *Thompson* v. *Louisiana*, 105 S. Ct. 409 (1985).

Judge Long ruled that the deputies may testify to items they observed when they initially secured the crime scene, but items later seized inside and outside the Cantrell residence would not be admissible at trial.

A nolle prosequi was granted by the court in indictment F82-50. This court adopts the same rulings (above stated) as Judge Long in new indictment F85-171.

*Contentions of Parties*

Cantrell contends that the oral and written statements made by him after the tainted illegal seizure of evidence is inadmissible under the "fruit of the poisonous tree" doctrine expressed in *Wong Sun* v. *United States*, 371 U.S. 471 (1963).

The Commonwealth argues that Cantrell's oral and written statements are admissible under the "purged taint exception" to the "fruit of the poisonous tree" exclusionary rule.

*Facts*

Cantrell's wife was murdered on December 8, 1981. On the night of the murder, Cantrell told Wise County deputy sheriff Jim Phillips (now deceased) what happened at the murder scene, i.e. that three people broke into his house, sat on him, beat him over the head, and murdered

his wife. This conversation took place before Cantrell knew the deputies had seized any items at the murder scene.

Cantrell also told "some close friends that asked" what happened at the murder scene on December 8. There was extensive publicity in the newspapers, T.V. and radio from December 8 to 14 about the murder and what items were found at the scene.

On December 14, 1981, deputy investigator Roy Nixon talked to Cantrell without warning him of his *Miranda* rights. Cantrell told him "essentially the same thing that his (written) statement says." Cantrell also reported to Nixon several specific items stolen from his home on December 8. At this time, Nixon was not aware what items had or had not been seized from the Cantrell home.

On December 21, 1981, Cantrell voluntarily talked to deputy sheriff Donnie Mullins. He asked to retrieve items taken from his home by deputies on December 8. Mullins did not deny that items had been found by the deputies, but he would not tell Cantrell what items were seized. Mullins told Cantrell he could not release these items until the conclusion of the trial.

On December 31, 1981, Cantrell came to the sheriff's office at the request of investigator Roy Nixon and gave a written voluntary statement in his own handwriting after being advised of and waiving his *Miranda* rights. The stolen items were not discussed at this time, nor were they mentioned by Cantrell in his written statement.

Cantrell was indicted on April 19, 1982, and arrested on April 20, 1982, for the murder of his wife.

Cantrell testified that he first discovered certain items had been found by the deputy sheriffs from the newspapers, apparently on December 21, the day he talked to Donnie Mullins. Cantrell claims that the seizure of all the items and more specifically two items, X-rated films and girlie magazines, "had a big bearing on my making that (written) statement"; that the public thought he was the murderer; and that the newspapers and rumors caused him to want "to clear my name."

Counsel's leading question, "If all of those items had not been seized on the night Judy was killed, would you have made that statement?" elicited Cantrell's legally reasoned response, "I don't think I would have."

*Law*

The "fruit of the poisonous tree' exclusionary rule operates not only against evidence seized and information acquired during an unlawful search or seizure but also against derivative evidence (including oral and written statements) discovered because of the unlawful act. *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 (1920); *Wong Sun* v. *United States*, 371 U.S. 471 (1963). See also ·*Nardone* v. *United States*, 308 U.S. 338 (1939)." *Warlick* v. *Commonwealth*, 215 Va. 263, 265 (1974).

The purged taint exception to the exclusionary rule was stated in *Wong Sun*, 371 U.S. 471 at 488: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"

In *Brown* v. *Illinois*, 422 U.S. 590 (1975), the Supreme Court held that the fact that an individual who was illegally arrested was given the *Miranda* warnings before he was interrogated would not, as a matter of law, purge the taint of the illegal arrest. But in order for the chain of taint to be broken, the statement must not only meet Fifth Amendment standards of voluntariness, but must be sufficiently an act of free will to purge the primary taint. In other words, the Fourth Amendment standards must also be met. Other factors must be considered: "The temporal proximity of the arrest and the confession, the presence of intervening circumstances. . . and particularly, the purpose and flagrancy of the official misconduct are all relevant." 422 U.S. at 603-604.

Since *Brown*, the Supreme Court has considered that the crucial factor in determining whether the evidence will be considered tainted is the good faith of the police officers. *Dunaway* v. *New York*, 422 U.S. 200 (1979); and *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980). Even *Wong Sun* stated the purpose of the exclusionary rule is "to deter lawless conduct by officers." 371 U.S. at 486. This court realizes that the Supreme Court has declined to declare

a "flagrant or purposeful illegal police conduct" exception to the exclusionary rule, but it has certainly ruled it to be one of the relevant factors to be considered in all of the cases.

### Findings of Fact and Law

1. *The threshold requirement of the Fifth Amendment Miranda warnings has been satisfied. Taylor* v. *Alabama,* 457 U.S. 687, 102 S.Ct. 2664 (1982). Cantrell was clearly advised, understood and voluntarily waived his *Miranda* constitutional rights. He does not object nor raise this issue here.

2. *The temporal proximity of the arrest and confession.* Cantrell's Voluntary Statement was not a confession. Counsel agree for the purposes of jury trial that Cantrell's written words will be referred to as a statement not a confession. In fact, Cantrell does not admit to committing a crime, but says that three other people perpetrated the murder of his wife.

Furthermore, the illegally seized evidence was acquired on December 8, 1981, and Cantrell learned of it through the newspapers on or before December 21. He made his Voluntary Statement on December 31, 1981. He was arrested on April 20, 1982, more than four months later.

The Supreme Court cases refer to only a few hours (two to six) between the time of illegal arrest and confession. But we do not have a close time problem or pressure on the defendant in Cantrell's case. Cantrell was not under arrest nor in police custody. He had his freedom of movement and ability to organize his thoughts for a period of ten and more days before making a statement.

3. *Presence of intervening circumstances.* Did Cantrell have ability to carefully and objectively consider his options and exercise his free will? (*Taylor* v. *Alabama,* 102 S.Ct. at 2668) The answer is yes. He learned of the items seized at his home on or before December 21, 1981, from the newspapers. He made the Voluntary Statement ten days later on December 31, 1981.

It is clear from the evidence that the motivating factor behind Cantrell's voluntary written statement was his concern that his private sexual habits (viewing X-rated movies and girlie magazines) would somehow cause the public to believe he murdered his wife not the fact that he had been confronted with the illegally seized

items. Even if this was a causal connection between the illegal search and seizure and Cantrell's statement, it was so attenuated and distant from the illegal search as to dissipate the taint.

This court cannot find as Cantrell claims that he was motivated to make the Voluntary Statement because all of the items were seized from his home.

Cantrell's written voluntary statement does not mention any specific items seized from his home. On the day Cantrell made the statement, he did not discuss these items with the deputy sheriffs. In fact, the written statement only addressed the murder of Cantrell's wife by three other people.

Furthermore, these identical oral statements were made by Cantrell to deputy sheriff Phillips, his close friends and to investigator Nixon prior to his knowledge of the illegally seized items.

This court finds that Cantrell's Voluntary Statement and conduct was "sufficiently an act of free will to purge the primary taint."

4. *The purpose and flagrancy of the official misconduct.* The deputy sheriffs inadvertently made a mistake in searching and seizing evidence without a search warrant subsequent to securing the crime scene. On the night of the murder, the deputy sheriffs did not know that the murder scene, the victim's house, William Jeffrey Cantrell's house and the later-accused Cantrell was one and the same. Nevertheless, the officers made a mistake violative of the Fourth Amendment. But it was not flagrant, bad faith, nor "lawless conduct by the officers."

The deputy sheriffs did not confront Cantrell with these items to force him to make a statement. They acted to the contrary by not telling him what items had been seized, and informed him that they could not release them until the conclusion of the trial.

Cantrell gave a list of stolen items at the time of the murder to investigator Nixon on December 14 to corroborate his statement that three other people robbed his home and murdered his wife. This was a voluntary act on his part to exonerate him from the murder caused by newspapers and rumors, not by the deputy sheriffs.

If "the police act illegally, but in a manner which is, if unreasonable under the Fourth Amendment, at least understandable, by, for example, searching the persons of occupants of a house for which they have obtained a

search warrant, a confession they obtain as a result of the arrest will be held admissible." *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980).

### Conclusion

When considering all of the above relevant factors as constitutionally mandated by the Supreme Court cases, this court finds that the deputy sheriffs did not exploit any direct or indirect (nor any oral or written statements) product of the illegal search. Thus no "causal connection," *Brown*, 422 U.S. at 603, much less a "close causal connection," *Dunaway*, 442 U.S. at 218, existed between the Fourth Amendment violation and Cantrell's Voluntary Statement or oral statements to the murder of his wife. The causal chain was broken. See *Reese* v. *Commonwealth*, 220 Va. 1035 (1980). The primary taint was purged.

The court holds that the oral statements and written voluntary statement by Cantrell were not tainted, and shall be admissible as a "purged taint exception" to the "fruit of the poisonous tree" exclusionary rule.