# Richmond

JOSEPH G. LEWIS v. COMMONWEALTH OF VIRGINIA.

April 21, 1952.

Record No. 3933.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*John M. Webster, James J. Laughlin* and *Albert J. Ahern, Jr.,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Joseph G. Lewis was indicted at the October, 1950, term of the court below for the armed robbery of Mrs. Marguerite D. Lee. Code, § 18-163. Upon arraignment he pleaded not guilty and was tried at the January, 1951, term by a jury which found him guilty as charged and fixed his punishment at confinement

in the State penitentiary for nine years. Judgment entered upon the verdict was stayed during the term upon the motion of the accused to set aside the verdict and award a new trial.

On February 20, 1951, the motion to set aside the verdict was heard and in support thereof the accused, in addition to a number of affidavits, introduced several witnesses who testified in open court. On April 20 the motion was overruled and final judgment entered on the verdict. The matter is now before us on a writ of error granted the accused to review that judgment and the proceedings below.

The record before us is so confusing that we deem it worth while to comment on the careless manner in which it was prepared and take note of the serious consequences which might have resulted therefrom.

The printed record contains more than 400 pages of testimony of some twenty-odd witnesses. The trial before the jury commenced on January 17 and ended on the 25th. There is nothing in the printed record to indicate the dates on which the several witnesses testified, but it is plainly apparent from the context that their testimony has not been printed in the proper sequence.

The confusing state of the record was the subject of discussion in the oral argument before us and subsequently counsel for the appellant filed with us a typewritten memorandum from which, for the first time, we are told that eighteen witnesses testified before the jury and five were heard in open court on the motion for a new trial. This situation is not discernible from either the printed or manuscript record, and the testimony of the witnesses who were heard by the jury is commingled in a most confusing manner with the testimony of those who were heard on the motion for a new trial. A single illustration will suffice to show how confusing and misleading is the record prepared in this manner.

One of the main contentions advanced by the accused before us is that H. L. Woodyard, the chief of police of Arlington county, suppressed and failed to produce at the trial a gun which the Commonwealth's evidence showed was displayed at the time of the robbery and was taken from the confessed accomplice, George W. Kiley, at the time of his arrest. The purport of Woodyard's testimony is that he had no knowledge of the whereabouts of this weapon.

Immediately following the testimony of Woodyard is that of Walter E. Bell, a lieutenant of the Arlington county police department, who produced the weapon in open court. The Attorney General quite naturally interpreted the record to mean that Bell had produced the weapon before the jury, and argued that it was obviously immaterial that Woodyard had not done so.

We are now told subsequent to the oral argument before us that Bell testified on February 20 on the motion for a new trial, and not before the jury. The typewritten manuscript shows this to be true.

The Attorney General in his brief has interpreted the testimony of other witnesses as having been submitted to the jury when we are informed by the typewritten memorandum filed by counsel for the appellant that these witnesses were heard on the motion for a new trial and did not appear before the jury.

Again, it is apparent from the context in some instances that the testimony of the witnesses who were heard by the jury is not printed in the proper sequence.

In the prosecution of an appeal it is the duty of the appellant or his counsel to present an intelligible record to this court, and failure to do so is a plain invitation to dismiss the appeal which is likely to be accepted. Where, as here, the sufficiency of the evidence is involved, the testimony of the several witnesses material to that issue should be printed in the order in which the witnesses appeared in the trial court. Unless this is done it is impossible for this court to have a true picture of what occurred in the court below.

The confusing state of the record is in no way attributable to the clerk of this court or to the printer. The same confusion exists in the typewritten manuscript of the evidence and the parts designated for printing.

According to the evidence of the Commonwealth, Mrs. Marguerite D. Lee, with her two small children, was at her home, 2700 South June street, in Arlington, about noon on March 13, 1950. Her husband, Blight H. Lee, was away from hime. In response to a knock, Mrs. Lee went to the front door and found there a man whom she later identified as George W. Kiley, who offered to sell her magazines. She told him that she was not interested and started to close the door. When she did this Kiley pushed the door open, drew a gun, and entered the house.

In the meantime a confederate, later identified as the accused, Joseph G. Lewis, who was wearing a mask, appeared from behind the near-by hedge, struck Mrs. Lee, and forced her back into the house. Lewis told her that they "meant business," "wanted the money," and that they had "heard" that there was a large sum of money, "fifty or sixty thousand dollars" in the house. Mrs. Lee remonstrated that she had no such money in the house and gave the men a bag containing some loose change.

After locking Mrs. Lee and the two children in the basement the men ransacked the house. They found and took with them a metal box or filing case. When the man had gone Mrs. Lee escaped from the basement and sounded an alarm.

On July 9, 1950, Kiley, accompanied by Bernard Mooney and James W. Smith, came to the Lee home for the purpose, they said, of using the telephone. Mrs. Lee recognized Kiley as one of the men who had participated in the robbery in March, but before she could notify the police the three men hurriedly left the scene in an automobile. They were followed and arrested the same day at Suitland, Maryland.

After Kiley had been returned to Arlington county he confessed his participation in the robbery of the Lee residence in March and implicated the accused, Joseph G. Lewis.

At the trial Kiley testified for the Commonwealth that he and Lewis had planned the robbery on March 12 at Keith's Theater in Washington where Lewis was employed; that they had been informed that Blight H. Lee was a gambler and kept a large sum of money in his house; and that at Lewis's suggestion Kiley purchased the Hallowe'en mask which Lewis was wearing at the time of the robbery. Kiley further testified that on the morning of the robbery he and Lewis went to Hertz U-Drive-It Garage on L street, in Washington, and rented a car in which they drove to the Lee home.

The record produced by the Hertz Garage showed that on March 13, 1950, the day of robbery, a car was rented to Joseph Gregory Lewis at 11:07 a. m. and returned at 1:56 p. m. The rental slip for the car carries the signature of Lewis which is identical with that affixed to a confession admittedly made by him.

Kiley testified that on the way to the Lee home they picked up a third man who was to participate in the robbery. This man, however, stated that he was an acquaintance of Mrs. Lee

and feared that she might recognize him. Accordingly, he left the car before it reached the Lee home.

Kiley's account of the robbery is in substantial accord with that related by Mrs. Lee. It was he, he said, who knocked at the door and with the drawn gun pushed by Mrs. Lee when she attempted to close it. Lewis, he said, after having put on the mask, came from behind the hedge, entered the house, and participated in the robbery.

Lewis and Kiley went back to Washington and returned the car to the Hertz Garage. They opened the bag and divided the contents which consisted of $80 in loose change. When the metal box turned out to contain valuable papers, but no money, they destroyed it.

When arrested on July 9, Kiley had in his possession the pistol which he was carrying at the time of the robbery. This was taken from him by members of the Arlington police department.

Kiley and Lewis were indicted at the October term and later admitted to bail. Kiley further testified that between the time they were released on bail and the date of the trial he and Lewis had several conversations during which Lewis tried to persuade him (Kiley) to repudiate his statement to the police that they had jointly participated in the robbery. Lewis wanted Kiley to assume sole responsibility for the crime. Kiley refused to do this.

One of these conversations took place at Kiley's home in Washington on the night of October 12, at which time by prearrangement two detectives, members of the District police force, Sergeants Coffee and Sparshot, were concealed and heard the entire conversation. During the conversation the detectives came from their hiding place and made their presence known to Lewis. Whereupon Lewis remarked, "I have stuck my foot into it now, really shot my mouth off."

Kiley's testimony as to this incident is fully corroborated by that of Sergeant Coffee. It is not denied by Lewis. Sparshot was ill at the time of the trial and did not testify.

Despite a rigid and searching cross-examination in which repeated aspersions were cast upon his veracity, mental capacity, and moral behavior, Kiley stuck to his story as to the participation of the accused in the robbery.

George E. Cooper, a member of the District police depart-

ment and an acquaintance of the accused's brother, Paul Clifton Lewis, who arrested the accused at Keith's Theater, testified that shortly thereafter Lewis freely confessed and admitted his participation in the robbery. There was no denial of this by the accused.

John A. Wise, a member of the Arlington police force, testified that on July 10 the accused, shortly after his arrest, made to him a full confession of his participation in the robbery. This was typed by a stenographer in the police department and read over by the accused. It was signed by the accused the next day after he had indicated his desire to "think it over." Lewis's signature is identical with that on the Hertz Garage slip.

It is not necessary to set out the signed confession which is quite lengthy. Suffice it to say that in every essential it accords with the testimony of Kiley, that of Mrs. Lee, and the evidence of the oral confessions of the accused.

The accused was called as a witness in his own behalf. His entire testimony, as found in the printed and typewritten record, relates to the circumstances under which he signed the typewritten confession in the presence of Wise. He did not deny that he participated in the robbery, or that he confessed such participation to Officers Cooper and Wise, or that he made the statements at Kiley's home within the hearing of Officers Coffee and Sparshot.

The accused offered evidence through other witnesses that he was attending to his duties at Keith's Theater at the time of the robbery. But the signature of the accused to the Hertz Garage slip, which shows that the vehicle was received by him at 11:07 a. m. and returned at 1:56 p. m. on that day, as well as the testimony of Kiley, are sufficient to sustain the jury's verdict denying the claim of alibi.

The accused also offered evidence that Kiley was mentally weak, morally depraved, and unworthy of belief. But, of course, the credibility of the witness was for the jury.

It is clear from what has been said that the evidence amply supports the verdict of the jury, and the general assignment that it was "against the weight of all the evidence" is not pressed in the brief. There is no assignment of error as to the court's rulings on the granting and refusing of instructions. Consequently, unless there be some error in the other rulings, the verdict and judgment must stand.

The main assignment of error is that the lower court erred in not granting appellant's motion for a new trial, because, it is said, H. L. Woodyard, the chief of police of Arlington county, suppressed and failed to produce at the trial the gun which had been taken from Kiley at the time of his arrest in Maryland on July 9.

On motion of counsel for the accused a subpoena *duces tecum* was served upon Woodyard, directing him to produce at the trial before the jury, among other things, "all weapons, guns, knives, etc. taken from George W. Kiley, one Mooney, and one Smith" at the time of their arrest on July 9. Pursuant to the subpoena Woodyard appeared and was called as a witness for the defense. He testified that from his "own personal knowledge" no weapons were taken from Kiley at the time of his arrest. He said that when such articles are taken from an arrested person an entry to this effect is made "on the property book and it is labeled and filed" among the police records. To the question "You have no such record in this case?" his reply was "That is correct." He was then asked "Was there anything taken from him?" to which he replied "To my knowledge, no."

After the examination of Woodyard had continued at some length the court sustained the objection of the Commonwealth's attorney that it was clear from the testimony of this witness that the desired records of the police department which "may come from any number of sources," could not be proven by him.

Counsel for the accused acquiesced in this ruling, saying "I see the wisdom of your Honor's ruling and the purpose of it." The matter was pursued no further at the hearing before the jury.

On the motion for a new trial the production of the gun and other weapons taken from Kiley at the time of his arrest was again brought up. Counsel for the accused said, "I am trying to develop * * * whether this gun and knife and blackjack are still in the possession of the police." The Commonwealth's attorney then suggested that Walter E. Bell was the "property man" in the police department who might supply the desired information. Bell was sent for and appeared in court, bringing with him what he described as an "envelope containing ammunition, a jackknife which bears the name of rigger's knife, a meat cleaver, a revolver, and a blackjack." The label on the envelope

indicated that these articles had been taken from the automobile in which Kiley, Mooney and Smith were riding at the time of their arrest on July 9.

Bell further testified that these weapons had been held in the property room of the police department, but that he had not discussed them with Woodyard who would not "necessarily" have known of them. However, he said that Woodyard "could have easily ascertained that there was such property" had he made the proper inquiry.

While the trial court expressed the view that Woodyard, upon receiving the subpoena *duces tecum,* should have made the proper inquiry which would have resulted in the production of the weapons, it ruled that the evidence did not sustain the contention of the accused that the witness had willfully refused to produce the gun at the trial and had suppressed it. It was, the court said, "obvious" that Woodyard's "testimony was confined to his own personal knowledge; that he produced the records that he had; that those records do not anywhere refer to a gun, and he made it clear that he had not brought the property book. Whether he should be cited for contempt will be considered by the court. But this seems to be beside the point." Moreover, as the court pointed out, when it sustained the objection of the Commonwealth's attorney that Woodyard had no personal knowledge of these records, counsel for the accused did not except to the ruling "but apparently agreed to it."

We are of opinion that the record fully justifies the ruling of the trial court that the gun had not been willfully suppressed by the police department.

We think, too, that it plainly appears from the record, as the trial court pointed out in its memorandum opinion, that had the matter been then pursued with reasonable diligence by counsel for the accused the gun could have been produced at the trial. Kiley had testified before the jury that he had in his possession at the time of his arrest the identical gun which he had carried at the time of the robbery and that this had been taken from him by the Arlington police. It had also been developed before the jury that Officers John Sanders and John A. Wise of the Arlington police department had brought Kiley from the place of his arrest in Maryland to the Arlington jail. Through these officers the disposition and whereabouts of the gun could easily have been traced.

Again, when Woodyard testified before the jury that he did not have the property book in his possession this could readily have been traced to Bell, the "property man," and would have resulted in the production of the gun, as was done at the hearing on the motion for a new trial.

But aside from all this, there is no showing that the rights of the accused were in any way prejudiced by the failure to produce the gun at the trial. As has been said, Kiley admitted that he had the weapon at the time of his arrest, that it was the same gun which he carried at the time of the robbery, and stated when and from whom he had acquired it. Just how the production of the weapon before the jury would have in any wise bettered the case of the accused is not made clear either in the court below or in the appellant's brief.

Next, it is said the trial court committed reversible error in admitting into evidence the signed confession of the accused. This assignment is without merit.

In the brief of the appellant this is said: "The police officers, in taking this statement, carefully omitted all that was favorable to appellant and in fact the cross-examination developed that the alleged confession of appellant was in reality a censored narrative of the case, composed by Lt. Wise. The examination also developed that the appellant was inveigled into signing the 'confession' while he was under great mental stress. The statement does not contain one question or answer, but consists of a narrative in which many of appellant's statements were omitted. The confession did not represent all the statements that took place between appellant and the police officers. The inadequacy of the statement reveals the fraud perpetrated by the police upon appellant at the time they obtained the statement from him."

We find in the record no basis for this criticism of Officer Wise, in whose presence the statement was typed, or of any other of the officers of the Arlington police department. Officer Wise testified that the statement was given by the accused "willingly" and "without hesitation;" that it was typed by Miss Cullins, a stenographer in the police department; and that after it had been concluded it was read by the accused. When the accused was asked whether he was willing to sign it, he replied "No, I would like to have a little time to think it over." The signature of the accused was affixed to the statement the next day in the presence of Officer Wise. There is not a scintilla of

evidence that in the meantime the accused was subjected to any force or threat, or that any reward was offered to him in return for his signature.

The testimony of the accused, as found in the printed record and typewritten manuscript, is confined to this subject. The full report reads thus:

"DIRECT EXAMINATION By Mr. Laughlin:

"Q. Was some paper prepared by someone?

"A. Yes, sir. There was a paper prepared in that room at that time.

"Q. Who prepared that?

"A. The young lady at the typewriter.

"Q. Who gave her the information that appeared thereon?

A. Well, sir, Mr. Wise kept asking me did so and so happen. At that time I was very much concerned about getting Clif out of jail because I was worried about Evelyn having to go to the hospital. I mean that thought was in my mind. I was frantic at that particular time. My own plight I didn't care about at that time. I knew I was working or had to be working some place that day that all of this questioning went on.

"Q. Will you tell us the reason why you signed a statement or a confession?

"A. Well, sir, I figured if I would sign a full statement of facts or anything they wanted me to sign and agree with anything they wanted me to do, they would let my brother go.

"Q. Is that the reason you signed it, sir?

"A. Yes, sir, it is."

It will be observed that the accused makes no claim that any of the recitals in the purported confession are untrue, or that any statements made by him had been omitted. The substance of his testimony is that he was prompted to make the confession in the hope that it might relieve his brother, Clif, of implication in the crime, and relieve the brother's wife, Evelyn, of the tension which she was suffering because of the affair.

But there is no assertion in this testimony of the accused that Wise, or any other official, promised or even suggested that the confession would bring about this result.

Moreover, as has been said, the accused did not deny his prior confession to Officer Cooper of the District of Columbia police force of his participation in the robbery, which in the main accords with the written confession. It will be recalled that the confession to Cooper was at the time of the arrest, and there is

no suggestion that this was prompted or brought about by the "frantic" concern of the accused over the involvement of his brother in the crime or the physical condition of his brother's wife.

Error is assigned to the action of the lower court in refusing to require the witness Kiley to submit to a mental examination to determine his competency as a witness. In the brief it is said: "Appellant at that time had reasonable grounds to believe that the witness Kiley was of unsound mind and that he harbored a bias and prejudice against appellant. The trial court denied appellant's request and took the view that it had no jurisdiction to compel the witness Kiley to submit to this mental examination. It is to be noted also that appellant's counsel did not specify a psychiatrist of his own choice to conduct the examination, but left it to the court to designate a psychiatrist to conduct the examination. The trial court maintained, however, that it was without power to do so."

This statement is not supported by any reference to the transcript of the evidence and incidents of the trial which would show when and how the matter was brought to the attention of the trial court and its ruling thereon. The only reference to the incident which we have been able to find in the record is an order entered on January 22, reciting that the defendant "advised the court that he would pay for a psychiatric examination of the Commonwealth's witness, George W. Kiley, and moved the court to order such examination, * * *." The order further recites that "The court inquired of the said George W. Kiley, after he had conferred with his attorney, as to whether or not he would consent to such examination and upon being answered in the negative" the motion was overruled.

There is nothing in the record to show that the purpose of the proposed examination of the witness, or what it would have revealed, as stated in appellant's brief, was brought to the attention of the trial court. Nor do we find in the record any substantiation of the statement in the brief that the trial court ruled that it was "without power" to require the witness to submit to such examination. Moreover, the record discloses no objection or exception to the adverse ruling on the motion.

We might content ourselves by saying that under such circumstances, by the plain terms of Rule 1:8 we are not required to pass upon this assignment.

But aside from this, the matter was clearly within the sound discretion of the trial court. It is the duty of the court to determine the competency of a witness, which it usually does by observation and consideration of his appearance, manner and statements. Where the issue of competency is raised the court may hear and consider the opinion evidence of experts. But whether it should do so in a particular case rests within its sound discretion, and its ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. 58 Am. Jur., Witnesses, § 124, p. 95.

In the present case, according to the manuscript record, Kiley testified on January 18, and the motion to require him to submit to an examination came afterwards. Thus, the trial court had already had the opportunity of hearing the witness testify, observing his demeanor on the stand, and was satisfied as to his competency. There is no showing that it abused its discretion in refusing to hear expert evidence on the subject.

The next assignment is that the trial court erred in not granting a new trial because of after-discovered evidence. After the verdict, and before the judgment entered thereon had become final, a written motion for a new trial was filed, supported by affidavits that since the trial Kiley, the confessed accomplice and a principal witness for the Commonwealth, had stated in an affidavit that his testimony implicating the accused in the robbery was false.

Kiley's affidavit is in the form of questions and answers under an *ex parte* examination by counsel for the accused in the presence of a notary public and court reporter, Norman L. Knauss. In substance, Kiley stated in the deposition that his testimony before the jury implicating the accused in the robbery was false and that it had been induced through threats against him by members of the District of Columbia and Arlington county police forces.

In the deposition Kiley also expressed doubt as to his own mental capacity to testify and indicated his need for psychiatric treatment. The deposition, he said, was given freely and voluntarily on his part and without influence exerted upon him from any source.

On the motion for a new trial Knauss testified in open court and verified the accuracy of the transcription of the deposition.

Kiley was then called as a witness for the accused in support of the motion for a new trial. While he admitted having

given the deposition as transcribed by Knauss, he repudiated the statements therein exonerating the accused from participation in the robbery. Each of these exonerating statements, he said, was false. He reaffirmed his testimony before the jury, saying that he had "told the truth" during the trial. In substance, he likewise repudiated his statements in the deposition that he had given testimony before the jury implicating the accused in the crime under threats of the police officers. He also repudiated statements made in the deposition to the effect that the Commonwealth's attorney had importuned him to testify falsely at the trial. The false statements in the deposition, he said, had been given pursuant to an arrangement made between him and counsel for the accused.

While discovery after trial, brought to the attention of the court in due time, that false testimony with respect to material facts has been given by a witness for the prosecution may constitute ground for a new trial, recantation by a State's witness does not necessarily entitle the accused to a new trial. The opportunity and temptation for fraud are so obvious that courts look with suspicion upon such an asserted repudiation of the testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to. For a collection of cases on the subject see 39 Am. Jur., New Trial, § 169, pp. 175, 176; Annotations: 33 A. L. R. 550, 74 A. L. R. 757, 158 A. L. R. 1062.

Deducible from the authorities are these principles: There must be clear and convincing proof that the witness testified falsely at the trial, and not merely proof that by reason of conflicting statements his testimony is unworthy of belief. Application for a new trial is addressed to the sound discretion of the trial court which has the opportunity of seeing and hearing the witness whose testimony is brought under attack, and the prime duty of determining whether he swore falsely at the trial. A new trial will not be ordered where it appears that, eliminating the disputed testimony, there remains sufficient evidence to sustain the verdict.

In *Powell* v. *Commonwealth,* 133 Va. 741, 112 S. E. 657, 33 A. L. R. 541, relied on by the accused, these principles were stated and applied. See also, *Leigh* v. *Commonwealth,* 192 Va. 583, 597, 66 S. E. (2d) 586, 595.

In the *Powell Case* evidence that a material witness had testified falsely at the trial was uncontradicted and this court

held that under the circumstances it could not "fairly conclude that the jury in such case would have come to the same conclusion had the perjured testimony been eliminated." 133 Va., at page 757.

The case now before us presents quite a different situation. While Kiley swore before the notary that he had given false testimony before the jury, when questioned in open court he repudiated the recantation and swore that the testimony given by him before the jury was true. Thus, while we know from his lips that this witness spoke falsely on one occasion, this does not establish that his testimony at the trial was false and the statements in the subsequent affidavit were true. In the final analysis proof of such conflicting statements amounts merely to an attack upon his credibility.

Then, too, the verdict does not rest upon the uncorroborated testimony of Kiley. We have the undenied confessions of the accused and the irrefutable documentary evidence. that he was in possession of the automobile at the time of the robbery. These corroborate in every detail the testimony given by Kiley at the trial and refute his statements given in the subsequent affidavit. Even if the testimony of Kiley is disregarded the jury could, in our opinion, have properly found no other verdict than that the accused was guilty as charged in the indictment.

The case is strikingly similar to that of *Powell* v. *Commonwealth*, 179 Va. 703, 20 S. E. (2d) 536, in which there was a motion for a new trial based on affidavits of several witnesses for the prosecution that they had committed perjury at the trial. When examined in open court on a motion for a new trial the affiants repudiated their affidavits and adhered to the testimony given by them at the trial. In this situation we held that the lower court did not err in overruling the motion for a new trial.

On the whole we find no merit in any of the assignments of error and accordingly the judgment is

*Affirmed.*