Present:  Kinser, C.J., Lemons, Goodwyn, and Millette, JJ., and
Carrico, Lacy, and Koontz, S.JJ.

DUSTIN ALLEN TURNER

v.  Record No. 101457    OPINION BY JUSTICE DONALD W. LEMONS
                                    September 16, 2011
COMMONWEALTH OF VIRGINIA

                FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, we consider whether the Court of Appeals

erred when it dismissed Dustin Allen Turner's ("Turner")

petition for a writ of actual innocence based on non-biological

evidence.

                 I.  Facts and Proceedings Below

     On Sunday, June 18, 1995, Turner and Billy Joe Brown

("Brown"), both Navy SEAL trainees, went to The Bayou, a

nightclub in Virginia Beach.  Brown had spent the afternoon

drinking heavily, and he and Turner left for The Bayou around

10:30 p.m.  Brown estimated that he drank six beers and eight to

ten shots of liquor during the afternoon, as well as an

additional six beers on the way to the nightclub and eight to

ten beers, eight to ten shots, and twelve mixed drinks while at

the nightclub.

     That same night, Jennifer Evans ("Evans"), who was

vacationing in Virginia Beach, decided to go to the nightclub

around 11:00 p.m. with her two friends, Andria L. Burdette

("Burdette") and Michelle McCammon ("McCammon").  Evans noticed

Turner, whom she had not previously met, and commented to her friends about him. Evans and Turner began talking and continued socializing on and off for the remainder of the night. Evans also met Brown briefly, but she did not continue socializing with him. According to Brown, Evans "[s]parked no interest" and he continued to purposefully drink excessive amounts of alcohol.

Around midnight, Burdette, who was the designated driver for the women, wanted to go home. Evans was still talking with Turner, and she wrote her phone number on a napkin and gave it to him. While Burdette and McCammon were waiting to leave, Evans stalled to continue talking to Turner. Turner and Evans seemed to be getting along very well, and at one point Turner sat in a chair while Evans perched on the armrest. Evans wanted to invite Turner back to their house, but Burdette refused.

Burdette and McCammon then walked out of the nightclub with Turner and Evans trailing behind them. The women entered their car, and while Evans sat in the back seat, Turner leaned against the back door and continued to talk with Evans through the open window. Turner offered to drive Evans home but Burdette refused the offer. Evans wanted to stay out longer, so Burdette and McCammon eventually agreed to leave Evans at the nightclub and return at 2:00 a.m. to take her home. Turner then "open[ed] the door with surprising force," and Evans got out of the car and walked back toward the nightclub with Turner.

Around 1:15 a.m., Turner approached Kristen H. Bishop ("Bishop"), Brown's ex-girlfriend, who worked as a waitress at The Bayou but was off-duty that night and socializing with friends. Turner asked Bishop if she could give Brown a ride home if Turner did not return to the bar before it closed, and Bishop agreed. Bishop understood this to mean that "[Turner] was planning on taking [Evans] home."

Between 1:15 and 1:30 a.m., the lights came on at the nightclub, signaling that it was almost time to close. Around this time, Julio C. Fitzgibbons ("Fitzgibbons"), a Navy SEAL who had met Brown and Turner that night, spoke with Brown and Turner about their plans for the rest of the evening. Fitzgibbons testified that Turner said that he and Brown "were going to have a threesome" with Evans. Shortly thereafter, Evans approached and Turner introduced her to Fitzgibbons. Fitzgibbons "gave [Turner] a thumbs up," and Turner returned the "thumbs up" and "[h]ad a smile on his face."

At approximately 1:35 a.m., Bishop saw Turner and Evans leave the nightclub holding hands. About ten minutes later, Brown told Bishop that he wanted to leave, but Bishop told him that she needed to wait a few minutes for her friend. At approximately 1:50 a.m., Brown became impatient and indicated an unwillingness to wait, so he left the nightclub and Bishop followed him outside. Bishop told him that she would wait for a

few minutes to give him a ride home if Brown was not able to find Turner, and she waited on a bench outside of the nightclub for approximately five minutes. At approximately 2:10 or 2:15 a.m., Bishop went back inside the bar, found her friend, and walked back out to her car. Bishop and her friend drove around the parking lot looking for Brown, and she left the premises after she did not find him.

When Burdette and McCammon returned to the nightclub at approximately 1:50 a.m., Evans was not in the parking lot where she had promised to meet them. They searched for her around the parking lot and oceanfront area until around 6:00 a.m. but were unable to find her. Later that day, they filed a missing persons report with the Virginia Beach police. On the following Wednesday morning, after reading about Evans' disappearance in the newspaper, Bishop contacted the police and told them that she had seen Turner and Brown with Evans on the night Evans disappeared.

On June 21, 1995, at approximately 9:00 p.m., Special Agents Thomas L. Carter ("Agent Carter") and Robert Elliot ("Agent Elliot") of the Federal Bureau of Investigation ("FBI") interviewed Turner at Fort A.P. Hill near Fredericksburg, Virginia. Turner told the agents that on Sunday night, he and Brown went to The Bayou, stayed until closing time, and then returned to the barracks by themselves.

4

When asked for further details, Turner said that he met two women at the nightclub that evening. Turner could not recall their names, but he said he continued to speak intermittently with the second woman, later identified by the agents as Evans, for the remainder of the evening. The woman was with two friends, who left the bar and planned to return around closing time to pick her up. Before the bar closed, the woman wrote her name and phone number on a cocktail napkin for him to call later in the week. Turner said that he and Brown left the nightclub while the woman was still waiting for her friends. After the agents continued to press Turner about the woman's name, Turner went to his barracks to retrieve the cocktail napkin, which had the name Jennifer and a phone number written on it.

In response to further questioning regarding Evans' disappearance, Turner told the agents that "he had believed at some point during the evening that there might be a chance that [Evans] would agree to leave with him," so Turner asked Brown to ride home with Bishop. However, Brown did not want to get a ride with Bishop, and Turner said that he told Evans he would try to contact her later in the week. Then, he and Brown left the nightclub alone. Turner also told the agents that neither he nor Brown had been drinking that evening. Agent Carter testified that throughout the interview, Turner appeared "very calm, very collected," and "very forthright."

Turner was subsequently interviewed on June 28, 1995, at the FBI headquarters in Richmond, Virginia, by Sergeant Thomas Baum ("Sergeant Baum") of the Virginia Beach Police Department's homicide unit. Turner told Sergeant Baum that he didn't begin speaking to Evans until about 12:30 a.m. on the night he met her at The Bayou. Later, around 1:00 a.m., Turner said that Evans' friends wanted to leave, so he walked the women to their car. Evans agreed to stay with him at the nightclub longer, and her friends agreed to return to pick her up at closing time. Just after the lights went on signaling that the bar was closing, Turner and Evans discussed meeting later in the week, and she wrote her phone number on a napkin for him. Turner then returned to Brown, who was persistent on leaving, so Turner and Brown left the nightclub around 1:45 a.m. without Evans. Sergeant Baum testified that the interview was "conversational," and Turner seemed "calm, cool," and "very straightforward."

Shortly after Sergeant Baum's interview, Turner was interviewed further by Detectives John T. Orr ("Detective Orr") and Al Byrum ("Detective Byrum") of the Virginia Beach Police Department. At first, Turner continued to adamantly deny any knowledge about what happened to Evans after he left her at the nightclub. However, as the officers "continued to speak to Turner, it became apparent that his denials became weaker and weaker" and his story began to change. Eventually, Turner told

6

the detectives that he would "tell [them] what [they] want to know," but that he needed to speak with his chief warrant officer first. After allowing him to do so, the detectives asked Turner where they could find Evans' body, and Turner described its location and drew a diagram of where it could be found. Later that afternoon, Turner traveled with the officers and helped them locate Evans' body. Turner also agreed to provide the police with his car and clothing from that night.

In response to direct questioning, Turner stated that he was not the person who killed Evans but that he was present when Brown killed her in Turner's car. Turner told the detectives that "Brown had choked Evans until she was dead" while they were in the parking lot of The Bayou.

After the police told Brown that Turner confessed and drew the map to the body, Brown wrote a statement for police that when he left the nightclub, he found Turner's car in the parking lot with Evans "passed out" in the backseat. Turner and Brown drove to a side street, parked the car, and they both began touching Evans. She woke up, started screaming, and Turner "started choking her. She stopped moving and we let go of her. She started spitting up some blood, and [Turner] started choking her again. [Brown] grabbed her arms and legs."

Then, approximately an hour later, Brown told police that he had not been honest and should "tell the truth." Brown wrote

7

another statement in which he explained that when he found Turner's car in the parking lot, Evans was in the backseat and Turner said, "Dude, I think I fucking killed her." Evans "had blood running out of her nose and foam coming out of her mouth." Turner and Brown drove away and dumped her body in the woods.

At his trial in May 1996, Brown testified that when he left the nightclub and approached Turner's car, he saw "two heads in the back [of the car]" before Turner jumped out and demanded that Brown get into the car. When he got into the car, Brown saw Evans lying in the back seat with "blood coming out of her nose" and "foaming out of the mouth," and her clothes were open with her breasts exposed. Brown testified that Turner said, "I think I fucking killed her." Brown said that he pulled her body down to the floorboard, and he thought she was dead because he saw no signs of life.

Brown said that Turner started driving away and said, "I know what we'll do. . . . We'll take her to the beach, we'll rape her, throw her in the water[] and [t]he cops will think she drowned." Brown was in and out of consciousness in the car, but he remembered that they drove on "the [6]4 freeway" and pulled off in a wooded area to dump Evans' body. Brown testified that two days later, Turner told him that he was attempting to have sex with Evans in the parking lot, but when she tried to stop him, Turner "put his forearm on her throat and pushed her back."

8

Turner said that "the next thing he knew [Evans] started spitting up blood and foam." Despite this testimony, Brown was convicted in June 1996 of murder, abduction with intent to defile and attempted rape, and he was sentenced to 72 years in prison and a $63,000 fine.

Turner's trial for murder and abduction with intent to defile began on August 26, 1996. Charlotte Lowe ("Lowe"), the forensic supervisor who analyzed the crime scene, testified that Evans' body was found in an advanced state of decomposition and skeletalization from being in the heat, sun, and elements for nine days. Evans' vest was pulled back and her bra was pulled up, exposing her breast. Her belt was unfastened, and her shorts and underwear had been pulled down so that they were only around one leg. Lowe also examined Turner's car for semen, fingerprints, and other physical evidence, but she found nothing of forensic value and no evidence suggesting that any sexual activity occurred inside the car.

Dr. Leah Bush ("Dr. Bush"), Assistant Chief Medical Examiner for the Commonwealth of Virginia in the Tidewater district, performed the autopsy on Evans' body and testified that it was impossible to determine the exact cause of death because her body was severely decomposed. However, she opined that manual strangulation was a possible cause of Evans' death, and she described the various chokeholds that could have led to

9

Evans' death.  Dr. Bush stated that when strangled, a person becomes unconscious "very quickly," within ten to thirty seconds.  However, the time required to cause death depends on the chokehold used, varying from "several seconds" to "less than a minute" to "three to five minutes."  Dr. Bush conclusively ruled out a broken neck as a cause of death because Evans' spinal cord did not show signs of fracture.

Todd P. Ehrlich ("Ehrlich"), a Navy SEAL who completed some training with Brown and Turner, testified that Brown and Turner had spoken previously about engaging in group sex. Specifically, Ehrlich testified that on June 16, 1995, two days before the night of Evans' disappearance, Turner and Brown were socializing with two women at a bar in Fredericksburg.  Ehrlich saw Turner alternating between talking to one of the women and then talking to Brown to give him a "progress report" in their attempts to convince the woman to "go home with them."  Ehrlich also testified that he witnessed Brown and Turner engage in group sexual intercourse with a woman while the three men were stationed in California in 1994.  Ehrlich testified that Turner and Brown bragged about how they later engaged in group sex again with the same woman.  Ehrlich could not remember what specific statements Turner made about group sex, and he testified that there was never any suggestion that the woman

involved was forced to act against her will or that the sexual activity involved physical violence.

At the conclusion of the Commonwealth's evidence, Turner moved to strike, arguing that the evidence was insufficient for the jury to find abduction with the intent to defile or murder. The trial court denied the motion, stating, "I don't think that [Evans] went knowingly and voluntarily with [Turner] to the parking lot or to his car for the purposes of engaging in a 'threesome' or what has been described as group sex with [Turner] and [Brown]; but we certainly know from the evidence in this case that that was [Turner's] intent."  The trial court further stated,

> It's clear from all the circumstances in evidence in this case that [Turner] had a sexual mode; and, of course, his specific intent to defile or sexually molest, as the law has stated many times, is derived not only from his conduct but from his statements as well.
>
> I certainly don't think that Jennifer Evans voluntarily left The Bayou with [Turner] and [Brown] for the purposes for being sexually molested and certainly not to be killed. . . .
>
> From all the evidence presented, we know that Jennifer Evans had made very specific plans to meet her two friends back in the parking lot of The Bayou nightclub at approximately 2:00 a.m. when it closed, and that was less than an hour from the time that she was seen returning to the nightclub with [Turner].  [Turner] was present when those plans were made. . . .
>
> The court is of the opinion, therefore, that the evidence in this case is sufficient to find

11

[Turner] guilty of both [abduction with intent to defile and murder] and the motion to strike will be overruled.

Turner testified in his own defense and stated that he did not kill Evans, nor did he ever intend to have sex with her. According to Turner, he and Evans discussed going to the beach to continue talking, but they abandoned that idea because it would have been impossible to do so and still return to the club by 2:00 a.m. to meet her friends. Turner also stated that when he informed Brown that Bishop would give him a ride home, Brown was "extremely drunk" and "seemed a bit angry at something," and Turner was not sure "if it was at [him] because [he] kind of palmed [Brown] off to get him a ride." He denied mentioning a "threesome" or group sex to Fitzgibbons.

Turner testified that he and Evans went to his car to listen to music and wait for her friends. While waiting, Turner saw Brown approach the car and told Evans to "pay no attention to this guy. He's drunk. Don't believe a word he says." Brown then entered the car and sat in the back seat directly behind Evans. Immediately, Brown began cursing and making belligerent remarks about Turner and Bishop. Then Brown shifted his attention toward Evans, and he made belligerent and vulgar comments to her, including asking if she was a virgin or had ever "had sex with a frogman." Turner could tell that Evans was

12

uncomfortable, and he told Brown to "chill out."  Brown started touching her hair, and Evans slapped his hand away.

Turner saw Brown respond by putting both of his arms around Evans' neck.  Turner testified that "it was like boom.  I looked over.  It was like a jerk and an instant motion."  Turner said that "[Brown's] arms were around her, [Brown] was pulling back; [Brown] was really squeezing, and she wasn't even moving." Turner testified that he tried to pry Brown's arms from her neck, and at the same time Brown was yelling at Turner to "[j]ust drive."  "[E]ventually [Turner] pried [Brown's] arms off of [Evans], and she was just limp."  Turner checked to see if she was breathing and checked her neck for a pulse, but he did not feel anything.  Brown continued to yell at Turner to drive, and Turner complied.

As Turner was driving, Brown reclined the passenger seat back and started "moving his hand into [Evans'] pants."  Turner yelled at him to stop, and Brown "just sat back and passed out." Turner drove to a secluded wooded area, where he and Brown took Evans' body out of the car.  Turner returned to his car to look for a shovel, and when he returned, Brown was laying on top of Evans' body.  Turner pulled Brown off, and Brown said, "It doesn't matter because I couldn't get it – a hard on anyway." Turner testified that they "grabbed some leaves and sticks and placed them on top of [Evans]" and left. Upon leaving the scene,

Brown again passed out in the car, but when he woke up he said that he was hungry so they stopped at a diner just outside of the military base.

The following morning, Turner and Brown met and signed a lease to be roommates for the coming year. Turner testified that on that day, Brown said to him, "I know what I did was stupid, and I'm sorry. I know it was stupid, but we've got to stick together now . . . . We're both in this now. We've got to stick together."

Concerning the false statements he made to police, Turner testified that he "felt like [he] couldn't turn back at that point, so [he] lied to the police to cover up for Brown." He confirmed talking with Fitzgibbons at The Bayou, but he denied talking about engaging in a "threesome" with Brown and Evans. In response to Ehrlich's testimony about group sexual intercourse with a woman in California, Turner stated that "it all center[ed] around one incident and bragging about that one incident." Turner stated that he knew Evans would not have sex with him because "[j]ust from the short time that [he] knew [Evans], [he knew that] she wasn't that type of girl at all."

At the conclusion of his trial, the jury was instructed on the legal theories of concert of action, principal in the first and second degrees, abduction with intent to defile, first degree felony murder, and accessory after the fact. On

14

September 5, 1996, the jury found Turner guilty of abduction with intent to defile, in violation of Code § 18.2-48, and first degree felony murder, in violation of Code § 18.2-32. The trial court imposed the jury's recommended sentence of 82 years in prison fixed by the jury.

Both Turner and Brown unsuccessfully appealed to the Court of Appeals and this Court, and, thereafter, both unsuccessfully sought state and federal habeas corpus relief. In all of his petitions, Brown repeatedly asserted that it had been Turner who had killed Evans.

On July 2, 2002, Brown provided a tape-recorded interview to Turner's attorney in which he confessed to acting alone in killing Evans, and he stated that "[his] actions in choking [Evans] came as a complete surprise to [Turner]." Brown said that he spontaneously choked Evans and then blamed Turner because he was angry that Turner betrayed him by telling the police what happened and where Evans' body was located.

On February 28, 2003, Brown signed an affidavit memorializing his statements from the taped interview. In the affidavit, Brown reiterated that he alone killed Evans, and that, "as a Christian, [he] can no longer allow someone who is innocent to continue to pay for what [he] did."

Code § 19.2-327.10 confers original jurisdiction upon the Court of Appeals of Virginia to consider a petition for a writ

15

of actual innocence based on newly-discovered, non-biological evidence filed by any individual "convicted of a felony upon a plea of not guilty."  Based on Brown's recantation, Turner filed a petition for a writ of actual innocence based on non-biological evidence in the Court of Appeals of Virginia, alleging that he was innocent of the crimes for which he was convicted.  In support of his petition, Turner submitted into evidence Brown's signed affidavit.

To obtain a writ of actual innocence, Turner must prove that the newly-discovered evidence

1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court;" Code § 19.2-327.11(A)(iv)(2),

2) "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court;" Code § 19.2-327.11(A)(vi),

3) "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt;" Code § 19.2-327.11(A)(vii), and

4) "is not merely cumulative, corroborative or collateral."  Code § 19.2-327.11(A)(viii).[1]

---

[1] The fourth and final issue was added upon Turner's motion to amend the order.

16

Carpitcher v. Commonwealth, 273 Va. 335, 343-44, 641 S.E.2d 486, 491 (2007).

In support of his petition, Turner asserted that the physical evidence and testimony is consistent with Brown's confession, and it "will prove that no rational trier of fact would have found [Turner] guilty beyond a reasonable doubt of the charges." Turner argued that "Brown's confession clears [Turner] of any wrong-doing other than being an accessory after the fact."

In support of its motion to dismiss the petition, the Commonwealth argued that the petition was without merit because "Brown's credibility has been so hopelessly compromised by his ever-evolving, conflicting accounts of his and Turner's actions on the night Evans was murdered that a reasonable trier of fact would hardly be compelled to credit his version of history." The Commonwealth asserted that even if a jury were to believe Brown's recantation, the other evidence against Turner was sufficient to find him guilty of murder and abduction with intent to defile either as a principal in the second degree or under the felony murder doctrine.

A panel of the Court of Appeals denied the Commonwealth's motion to dismiss and entered an order finding that resolution of the case required further development of the facts, and, pursuant to Code § 19.2-327.12, it remanded the matter to the

17

circuit court[2] to certify findings of fact regarding the following issues:

1) whether Brown's recanted testimony is credible in his assertion that he testified falsely at the petitioner's trial,

2) if the answer to Question #1 is "yes," did Brown testify falsely as to any material fact,

3) if the answer to Question #1 is "yes," was Brown's recantation testimony unknown or unavailable to the petitioner or his counsel at the time the conviction became final, or could such recantation testimony, through the exercise of diligence, have been discovered or obtained before the expiration of 21 days following the entry of the final order of conviction, [and]

4) is Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim?[3]

During a two-day hearing, the circuit court heard testimony from both Brown and Turner. Brown testified that on the night of June 18, 1995, he purposefully consumed excessive amounts of alcohol. Brown confirmed that Turner arranged for Bishop to give Brown a ride home so that Turner could spend more time with Evans, but Brown became impatient and left the nightclub. Brown admitted that, by this point, he was extremely intoxicated and on the verge of passing out. He testified that he found

---

[2] Herein, the term "trial court" will be used to designate the courts where the actual trials of Brown and Turner took place. The term "circuit court" will be used to designate the court where the hearing upon remand took place.

[3] The fourth and final issue was added upon Turner's motion to amend the order.

Turner's car in the parking lot and climbed into the back seat

behind Evans.  He testified:

> I was talking to [Turner and Evans].  I said
> something – I don't even remember – and I started
> playing with [Evans'] hair, and then I think I
> sat back in the seat, and then one minute I was
> normal and the next minute I snapped and I
> started choking her; and I think [Turner] – I
> believe I recall him trying to pull my arm away.
> I believe he did.  I'm not 100 percent sure, but
> I believe so.  Then I continued to choke her and
> then I told him to drive and he started to drive.

He stated that he choked Evans by putting his left arm against

her neck and holding it against the seat's headrest with his

right arm.

Brown also admitted to providing police with conflicting

accounts of how the murder occurred and that he repeated the

lies at his own trial.  He testified that he lied about Turner's

involvement in the murder because he was angry with Turner

because he "snitched" and told police where Evans' body was

located.  However, after he converted to Christianity, he knew

that he needed to come forward and tell the truth.  Brown said

that it was difficult to "stand up before the whole world and

tell them not only [that he was] a murderer and a liar but [also

that he] betrayed [his] best friend."

Still, Brown's testimony before the circuit court was

inherently conflicting.  Brown stated that while he was at The

Bayou, he "purposely decide[d] not to talk to any girls" because

19

he was in a relationship. He stated that usually when he went to bars, "my goal was either one of two things: Meet a girl and have sex or drink lots of alcohol. And since that night I wasn't looking to have sex with anybody, I just decided to drink lots of alcohol." During his original trial, he also testified that Evans "[s]parked no interest for [him]." However, Brown also admitted that just a short time later, he defiled Evans' body by undressing her in the car, "moving his hand into her pants," and he removed Evans' vest and pulled her pants down. He also testified that he attempted to have sex with Evans' body after he and Turner placed it in the woods but that Turner stopped him.

Additionally, during cross-examination, the Commonwealth questioned Brown about a second version of his affidavit ("second affidavit"), in which Brown stated that he had to strangle Evans twice to kill her. This testimony was in contradiction to the affidavit submitted in support of Turner's petition ("first affidavit") and Brown's earlier testimony during direct examination, both of which proffered evidence showing that Evans died instantly. Specifically, during the cross-examination the following exchange occurred:

> [Commonwealth:] Let me read you a few sentences of this affidavit you signed. [Turner] did not encourage me in any way and, in fact, I remember one instance while I was choking [Evans], [Turner] tried to pull my hands away. [Evans]

20

became unconscious and I believed she was dead. I fell back in the seat, and she woke up. I then choked her again until blood came out of her nose and am certain she was dead at that time. . . .

That statement reflects, does it not, that she was not killed instantly or rendered helpless instantly but, in fact, revived and you had to choke her a second time, correct?

[Brown:] Yes. . . .

[Commonwealth:] [W]as there a period where she was seemingly unconscious or worse and then revived and then you had to assault her a second time? Is that, in fact, the case?

[Brown:] Yes. Yes.

Upon review of this record, it is apparent that two versions of Brown's affidavit existed. Both versions of the affidavit bear the same date, as well as an identical handwritten statement and signature by Brown. However, the font utilized on the second page of the second affidavit is different than the font utilized on the second page of the first affidavit. It would appear that a change of font was necessary to begin and end the second page with the same words. The only reasonable conclusion to be drawn from these two versions is that, at some point before the circuit court's evidentiary hearing, the second page of the three-page affidavit was substituted.

The two versions of Brown's affidavit differ significantly in their substance. In the first affidavit, which was presented

21

in support of Turner's petition, Brown stated that Evans died almost instantly:

> We were sitting there [in the car] talking and next thing you know I reached up and choked [Evans]. I did this on my own without any prior discussion with [Turner]. He did not encourage me in any way and in fact, I remember one instance while I was choking [Evans], [Turner] trying to pull my hands away. [Evans] became unconscious and I am certain she was dead at that time
>
> . . . .
>
> [Turner] was my friend, but I told the police he was involved when I was informed he had "rolled" on me and had told the authorities where [Evans'] body was located.

In the second affidavit, Brown stated that Evans revived:

> We were sitting there [in the car] talking and next thing you know I reached up and choked [Evans]. I did this on my own without any prior discussion with [Turner]. He did not encourage me in any way and in fact, I remember one instance while I was choking [Evans], [Turner] trying to pull my hands away. [Evans] became unconscious and I believed she was dead. I fell back in the seat and she woke up. I then choked her again until blood came out of her nose and [I was] certain she was dead at that time.

Brown's testimony during direct examination was consistent with the first affidavit; however, during cross-examination, Brown's testimony was consistent with the second affidavit. Despite these contradictions, the circuit court made the following findings:

> This court determines that Mr. Brown's recanted testimony is credible in his assertion that he testified falsely at his own trial. This court

22

determines that Mr. Brown testified falsely at his own trial as to a material fact in the case. This court further finds that Mr. Brown's recantation of his earlier testimony was unknown and was unavailable to the petitioner in this proceeding, Mr. Turner, at the time of his conviction and at the time his conviction became final. And this court finally finds that Mr. Brown is credible in his assertion that he acted independently in murdering the victim and that Mr. Turner had no role in the murder or in the restraining of the victim.

It is clear from this record that at the time of the evidentiary hearing, neither Turner, the Commonwealth, nor the trial court were aware that two affidavits were in existence. Apparently, each lawyer thought that they were utilizing the same document. The confusion on the matter was resolved after the circuit court's findings were transmitted to the Court of Appeals. Then, in this original jurisdiction proceeding, the Commonwealth submitted the second affidavit to the Court of Appeals without objection from Turner.

In a 2-1 decision, a panel of the Court of Appeals granted Turner's request for a writ of actual innocence, vacated his convictions for murder and abduction with intent to defile, and held that, at most, he could be found guilty of being an accessory after the fact to murder. Turner v. Commonwealth, 54 Va. App. 458, 680 S.E.2d 312 (2009). Citing Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490, the panel held that "we cannot say that the circuit court's factual findings are plainly wrong or

without evidence to support them and, therefore, we are bound by these findings."  Turner, 54 Va. App. at 475-76, 680 S.E.2d at 321.

In light of the circuit court's determination that "Turner played no role in the murder or in the restraining of the victim," the panel concluded that "the circuit court's use of the word 'restraint' constitutes a finding that Turner did not participate with Brown in an abduction by either force or deception." Id. at 479, 481, 680 S.E.2d at 323.  Instead, the panel held that Brown "acted as an independent and superseding force so that his actions constituted a separate – and completely coincidental – enterprise with no causal connection to Turner's own conduct."  Id. at 482, 680 S.E.2d at 324.

The panel further held that "the evidence is insufficient to support a finding beyond a reasonable doubt that Turner made any statement or engaged in any act showing an intent to deceive Evans for the purpose of sexually molesting her against her will," which precludes "any rational trier of fact from finding Turner guilty beyond a reasonable doubt of abduction with intent to defile."  Id. at 484, 680 S.E.2d at 325.  Rather, "[i]n light of Brown's recantation, the evidence proves beyond a reasonable doubt, at most, that when Turner invited Evans to wait in his car for her friends, he did so with the hope of persuading her to have consensual sexual contact."  Id. at 487, 680 S.E.2d at

24

327. The panel concluded that the evidence was sufficient to find Turner guilty of being an accessory after the fact, and it remanded the case to the circuit court to modify his conviction. Id. at 491-92, 680 S.E.2d at 329.

However, the Court of Appeals granted the Commonwealth's petition for a rehearing en banc, Turner v. Commonwealth, 54 Va. App. 699, 682 S.E.2d 77 (2009), and, upon rehearing, dismissed Turner's petition for a writ of actual innocence. Turner v. Commonwealth, 56 Va. App. 391, 694 S.E.2d 251 (2010). The five-judge majority held that while it was bound by the circuit court's credibility determination, "a rational fact finder could have found that Turner abducted Evans by deception – meaning no finding of force or restraint would have been required – and that the abduction ended with Evans' murder." Id. at 419, 694 S.E.2d at 265.

In support of its holding, the Court of Appeals relied on circumstantial evidence supporting deception, including Turner's request to Bishop to give Brown a ride home, Turner's conversation with Fitzgibbons about a "threesome" he was going to have with Evans, evidence of Evans' character, Turner's rude behavior toward Evans' friends, his "callous disregard" for Evans' body, his lead role in finding an isolated location to dispose of her body, and Turner's lies to the police. Id. at 424-27, 694 S.E.2d at 267-69. Based on this evidence, the Court

25

of Appeals dismissed Turner's request for a writ of actual innocence and denied his request to vacate his convictions for murder and abduction with intent to defile. Id. at 429, 694 S.E.2d at 270.

Turner timely filed his notice of appeal to this Court, and we awarded Turner an appeal on the following assignments of error:

1.   The Court of Appeals erred in refusing to grant the writ of actual innocence and vacate Turner's convictions for murder and abduction with intent to defile.

2.   The Court of Appeals erred in ruling that "a rational fact finder could have found that Turner abducted Evans by deception – meaning no finding of force or restraint would have been required – and that the abduction ended with Evans' murder."

3.   The Court of Appeals erred in ruling that "it cannot be said that Brown's credible recantation provides this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will. Therefore, Turner was properly convicted of abduction with intent to defile and murder."

We also granted the Commonwealth's assignment of cross-error:

1.   The Court of Appeals wrongly held that it was bound by the circuit court's finding that the co-defendant's post-trial statements were "credible."

II. Analysis

A. Standard of Review

We apply the standard of review as set forth in Carpitcher and Johnson v. Commonwealth, 273 Va. 315, 641 S.E.2d 480 (2007),

26

in which we considered appeals from the Court of Appeals'
dismissals of petitions for a writ of actual innocence based on
non-biological evidence.  We held that

> in an appeal from the Court of Appeals' dismissal
> of such a petition, we will review de novo the
> Court of Appeals' conclusions of law and its
> conclusions based on mixed questions of law and
> fact.  However, when the Court of Appeals has
> referred issues in the case to a circuit court
> for factual findings under the provisions of Code
> § 19.2-327.12 and the Court of Appeals has
> approved those findings, we will be bound by the
> factual findings unless they are plainly wrong or
> without evidence to support them.

Johnson, 273 Va. at 321, 641 S.E.2d at 483 (citations omitted).

   B. Abduction with Intent to Defile and Felony Murder

Pursuant to Code § 19.2-327.12, the Court of Appeals may
refer factual issues in a petition for a writ of actual
innocence to a circuit court:

> If the Court of Appeals determines . . . that a
> resolution of the case requires further development
> of the facts, the court may order the circuit court
> in which the order of conviction was originally
> entered to conduct a hearing . . . to certify
> findings of fact with respect to such issues as the
> Court of Appeals shall direct.

This statute gives the Court of Appeals broad discretion to
certify to the circuit court issues of fact that must be
resolved before deciding the merits of a petition.  Johnson, 273
Va. at 322, 641 S.E.2d at 484.

As we explained in Carpitcher, "to be 'material' within the
meaning of Code § 19.2-327.11(A)(vii), evidence supporting a

27

petition for a writ of actual innocence based on non-biological evidence must be true."  273 Va. at 345, 641 S.E.2d at 492. "Because the Court of Appeals cannot hold its own evidentiary hearing to assess a witness' credibility, but must ultimately determine whether a recantation is true, Code § 19.2-327.12 provides a mechanism to assist the Court of Appeals in this task."  Johnson, 273 Va. at 322, 641 S.E.2d at 484.

When the circuit court conducts its evidentiary hearing, we have observed that

> [T]here is no mandatory formula for a circuit court's consideration of the credibility of a particular witness.  As the trier of fact, the circuit court is charged with the responsibility of considering various factors, including the witness' demeanor, his opportunity for knowing the things about which he has testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony.  In addition, the circumstances of a particular case may raise other factors that the circuit court deems relevant in assessing a witness' credibility.

Id. at 323, 641 S.E.2d at 485.  In reviewing the circuit court's factual findings, we have explained that

> [s]uch factual findings are similar to circuit court findings made under Code § 8.01-654(C) in habeas corpus cases in which we have original jurisdiction and have referred factual issues to the circuit court for an evidentiary hearing. Therefore, we will apply to the factual findings contained in the record of the Court of Appeals a standard of review similar to the standard we apply to factual findings entered in our original jurisdiction habeas corpus proceedings.  We will be bound by the factual findings in the present

28

record, as approved by the Court of Appeals, unless they are plainly wrong or without evidence to support them.

Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490.

In Carpitcher, we observed that

recantation evidence is generally questionable in character and is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud.

Unless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness herself.

Id. at 346, 641 S.E.2d at 492 (citations omitted). In considering Brown's recantation testimony here, as we stated in Lewis v. Commonwealth, 193 Va. 612, 626, 70 S.E.2d 293, 302 (1952), "while we know from his lips that [he] spoke falsely on one occasion, this does not establish that his testimony at the trial was false and the statements in the subsequent affidavit were true." At the circuit court's evidentiary hearing, Brown admitted that before signing the affidavit,[4] he gave six different statements – including one under oath – regarding the circumstances of Evans' death, and each of them differed substantively from his affidavit and testimony before the circuit court.

However, beyond its questionable reliability, Brown's recantation testimony was rife with conflicting statements.

---

[4] Presumably, Brown was referring to the first affidavit, which was part of Turner's petition.

Brown stated that while he was at The Bayou, he "wasn't looking to have sex with anybody," and he testified that Evans "[s]parked no interest for [him]." However, he admitted that just a short time later, he defiled Evans' body by undressing her body in the car, "moving his hand into her pants," and by attempting to have sex with her body when he and Turner placed her in the woods. These statements regarding Brown's sexual desire are inherently conflicting and undermine the credibility of his testimony.

The inconsistencies are most glaring when we consider Brown's disparate accounts of Evans' death, both in the two affidavits and in his testimony before the circuit court. Brown's testimony during direct examination matched his statement in the first affidavit – that when he began to strangle Evans she died almost instantly. Brown testified that her death was so quick that Turner "would have had virtually no chance to react and try to save her."

However, according to the second affidavit and Brown's testimony during cross-examination, Evans "revived" and Brown had to strangle her again to kill her. Before the circuit court, Brown affirmed the statement he made in the second affidavit – that after he began choking Evans,

> [she] became unconscious and I believed she was
> dead. I fell back in the seat, and she woke up. I

> then choked her again until blood came out of her
> nose and [I was] certain she was dead at that time.

Brown confirmed that "[Evans] was not killed instantly or rendered helpless instantly but, in fact, revived and [Brown] had to choke her a second time." Finally, on re-direct examination, Brown testified that by stating that Evans "revived," he meant that "[s]he took in a deep breath," and he stated that it was only a matter of one or two seconds from the time that she revived until the time he began to choke her again.

The circuit court's focus was upon the wrong issues. The circuit court stated that it "finds" that Brown "acted independently in murdering the victim and that Mr. Turner had no role in the murder," and that Turner did not engage "in the restraining of the victim." To the extent that this "finding" suggests that the offense of abduction did not occur, it is a conclusion of law that we review de novo. Commonwealth v. Morris, 281 Va. 70, 76, 705 S.E.2d 503, 505 (2011). Whether Turner committed abduction with intent to defile and whether Turner is guilty of felony murder under these facts are questions of law. We will focus upon the legal conclusions that the circuit court reached that are not entitled to the traditional deference we afford to credibility findings.

31

Because Turner was found guilty of felony murder, the relevant question before us is not whether Brown acted alone in choking Evans or restraining her as Turner claims and as Brown now alleges, but rather whether Turner abducted Evans with the intent to defile her. The fact that Brown now confesses that he acted alone in restraining and choking Evans does not absolve Turner of his guilt.

Code § 18.2-47 does not use the word "restraint" in its definition of abduction. Use of that word in the context of abduction comes from our case law. For example, in Jerman v. Dir., Dept. of Corrections, 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004), the word "restraint" is used to describe how the particular facts of that case satisfied the elements of the offense. Concerning this case, the elements of the offense of abduction require seizing, taking, transporting, detaining or secreting another person with the intent to deprive such other person of his or her personal liberty. Code § 18.2-47. Significantly, the elements of the offense require that such acts be accomplished by "force, intimidation or deception." Id. The issue in Turner's case is not restraint; rather, it is deception. In this regard the circuit court's "finding" that Turner did not restrain the victim does not address the issue of deception.

A defendant is guilty of first degree murder under Code § 18.2-32 where the killing occurs "in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate sexual penetration, robbery, burglary or abduction." This statute codifies the common law doctrine of felony-murder and, "when supported by the evidence, operates to elevate to second-degree murder a homicide committed during the commission of a felony by imputing malice to the killing." Commonwealth v. Montague, 260 Va. 697, 700, 536 S.E.2d 910, 912 (2000) (citing Heacock v. Commonwealth, 228 Va. 397, 403, 323 S.E.2d 90, 93 (1984); Wooden v. Commonwealth, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981)). The felony murder statute applies "where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection." Haskell v. Commonwealth, 218 Va. 1033, 1041, 243 S.E.2d 477, 482 (1978).

The question before us is a narrow one. Code § 19.2-327.11(A)(vii), requires that the newly-discovered evidence be "material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Of course, in order to be material, the evidence must be true. Additionally, "[e]vidence that relates to a matter that is properly at issue in the case is said to be material." Charles

E. Friend, The Law of Evidence in Virginia § 11-1 at 431 (6th ed. 2003).  The newly-discovered evidence in this case is not material.

Turner's assignments of error and argument focus upon proof of abduction with intent to defile.  Brown's recantation focuses upon whether he alone restrained and choked Evans.  The pertinent circuit court "finding" is that Brown "acted independently in murdering the victim and that Mr. Turner had no role in the murder or in the restraining of the victim." Significantly, Brown's recantation and the circuit court's "finding" do not address the issue raised by Turner's assignments of error and argument.

Turner argues that no rational trier of fact, upon consideration of Brown's recantation, could find Turner guilty beyond a reasonable doubt of abduction with intent to defile. Because nothing in Brown's recantation is material to this issue, the evidentiary record on this issue, with and without the recantation, is essentially the same.

Simply stated, nothing in Brown's recantation or the circuit court finding has any bearing on the question presented in this petition. Turner has not met his evidentiary burden under the statutory provisions.

### III. Conclusion

The Court of Appeals did not err in dismissing Turner's petition for a writ of actual innocence and in denying his request to vacate his convictions for murder and abduction with intent to defile.  Accordingly, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.